911 F.2d 882
 53 Fair Empl.Prac.Cas. 1077,
54 Empl. Prac. Dec. P 40,144, 59 USLW 2110,
62 Ed. Law Rep. 460
 UNITED STATES of America, Appellant in No. 89-1694,
v.
BOARD OF EDUCATION FOR the SCHOOL DISTRICT OF PHILADELPHIA;
and Commonwealth of Pennsylvania.
UNITED STATES of America
v.
BOARD OF EDUCATION FOR the SCHOOL DISTRICT OF PHILADELPHIA;
and Commonwealth of Pennsylvania.
Appeal of BOARD OF EDUCATION FOR the SCHOOL DISTRICT OF PHILADELPHIA.
 Nos. 89-1694, 89-1740.
 United States Court of Appeals,
Third Circuit.
 Argued Jan. 31, 1990.
Decided Aug. 9, 1990.
Rehearing and Rehearing In Banc Denied Sept. 12, 1990.
 
 Michael Baylson, U.S. Atty., James P. Turner, Acting Asst. Atty. Gen., Jessica Dunsay Silver (argued), Linda F. Thome, Attys., Civil Rights Div., Dept. of Justice, Washington, D.C., for U.S.
 Ernest D. Preate, Jr., Atty. Gen., Susan J. Forney, Calvin R. Koons, Sr. Deputy Attys. Gen., John G. Knorr, III (argued), Chief Deputy Atty. Gen., Chief, Litigation Section, Office of Atty. Gen., Harrisburg, Pa., for the Com. of Pa.
 Sally Akan, Robert T. Lear (argued), School Dist. of Philadelphia, Office of General Counsel, Philadelphia, Pa., for Bd. of Educ. for the School Dist. of Philadelphia.
 Amy Adelson, Marc D. Stern, Lois C. Waldman, Jeremy S. Garber, American Jewish Congress, New York City, for American Jewish Congress as amicus curiae.
 Robert W. Nixon, Walter E. Carson, Silver Spring, Md., Rolland Truman, Long Beach, Cal., Harold Lance, Ontario, Cal., Lee Boothby, Boothby, Ziprick & Yingst, Berrien Springs, Mich., for Council on Religious Freedom and Americans United for Separation of Church and State as amici curiae.
 Before STAPLETON and MANSMANN, Circuit Judges, and ACKERMAN, District Judge*.
 OPINION OF THE COURT
 STAPLETON, Circuit Judge:
 
 
 1
 In this case the United States uses Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e et seq., to advance what would more commonly be a free exercise clause challenge (1) the refusal of the defendant Board of Education for the School District of Philadelphia ("Board") to allow a public school teacher to wear religious attire in the course of her duties, and (2) to the Commonwealth of Pennsylvania's "Garb Statute," 24 Pa.St.Ann. Sec. 11-1112, which compelled the Board's action. We conclude that the United States Supreme Court's summary disposition of an appeal from a decision of the Oregon Supreme Court in a case presenting such a free exercise challenge, Cooper v. Eugene School District No. 4J, 301 Or. 358, 723 P.2d 298 (1986), appeal dismissed, 480 U.S. 942, 107 S.Ct. 1597, 94 L.Ed.2d 784 (1987), ultimately compels us to reject the Title VII claim currently before us, although moving from Cooper's free exercise holding to the Title VII claim requires some analysis.
 
 I. Facts
 
 2
 Alima Delores Reardon is a devout Muslim with a religiously held conviction that Muslim women should, when in public, cover their entire body save face and hands. Since 1970, Reardon had from time to time worked as a substitute and full time teacher in the Philadelphia School District, positions for which she held the necessary certificate and other qualifications. Reardon first embraced her religious conviction regarding dress in 1982, and pursuant to her belief "she wore while teaching ... a head scarf which covered her head, neck, and bosom leaving her face visible and a long loose dress which covered her arms to her wrists." District Court Finding of Fact p 5. Apparently Reardon taught in this attire without incident until 1984.
 
 
 3
 Towards the end of 1984, on three separate occasions Reardon reported to various schools for duty as a substitute teacher and was informed by the principals of those schools that, pursuant to state law, she could not teach in her religious clothing. These actions were taken in compliance with what is commonly referred to as Pennsylvania's Garb Statute, enacted in 1895 as Public Law No. 282:
 
 
 4
 (a) That no teacher in any public school shall wear in said school or while engaged in the performance of his duty as such teacher any dress, mark, emblem or insignia indicating the fact that such teacher is a member or adherent of any religious order, sect or denomination.
 
 
 5
 (b) Any teacher ... who violated the provisions of this section, shall be suspended from employment in such school for the term of one year, and in case of a second offense by the same teacher he shall be permanently disqualified from teaching in said school. Any public school director who after notice of any such violation fails to comply with the provisions of this section shall be guilty of a misdemeanor, and upon conviction of the first offense, shall be sentenced to pay a fine not exceeding one hundred dollars ($100), and on conviction of a second offense, the offending school director shall be sentenced to pay a fine not exceeding one hundred dollars and shall be deprived of his office as a public school director. A person twice convicted shall not be eligible to appointment or election as a director of any public school in this Commonwealth within a period of five (5) years from the date of his second conviction.
 
 
 6
 24 Pa.St.Ann. Sec. 11-1112. On each occasion Reardon was given a chance to go home and change; on each occasion she refused to do so and was not allowed to teach. After exhausting her remedies within the school system, Reardon filed charges of discrimination with the district office of the Equal Employment Opportunity Commission ("EEOC").
 
 
 7
 Upon receiving Reardon's complaint, the EEOC District Office conducted an investigation. During that investigation, the Commonwealth, through its Attorney General, took the position that the Garb Statute was constitutionally valid and enforceable. The EEOC ultimately concluded there was reasonable cause to believe that both the School Board and the Commonwealth had violated Title VII. After pursuing all prescribed conciliation without success, the EEOC transmitted Reardon's charge to the Department of Justice, pursuant to 42 U.S.C. Sec. 2000e-5(f)(1), which requires such referral when the respondent to a charge filed under Title VII is a "government, governmental agency, or political subdivision." The Justice Department then filed a complaint in district court, naming both the Commonwealth and the Board as defendants.
 
 
 8
 The complaint asserted two theories of liability against the Board: (1) "Failing or refusing to employ as public school teachers individuals who wear or who seek to wear garb or dress that is an aspect of their religious observance," and (2) "[f]ailing or refusing reasonably to accommodate individuals who wear or who seek to wear garb or dress ... that is an aspect of their religious observance and practice." The complaint also asserted that the Commonwealth violates Title VII by "[c]ontinuing to give force and effect to Section 11-1112." In addition, the complaint charged that both defendants engaged in a "pattern of practice of resistance to the full enjoyment by public school teachers or would be public school teachers ... of their right of equal employment opportunities without discrimination based on religion." As discussed below, such an allegation is a necessary condition to obtaining prospective injunctive relief against a discriminatory practice. The United States sought a declaration that the Garb Statute is in conflict with Title VII and therefore unenforceable, as well as injunctive relief and damages.
 
 
 9
 After a bench trial, the district court entered judgment in favor of the United States and against the School Board, ordering the Board to make Reardon whole and enjoining it from giving any further effect to the Garb Statute. However, concluding that the Commonwealth was not an "employer" of Reardon within the meaning of Title VII, and that in light of evidence that the Garb Statute was sporadically enforced there was no "pattern or practice" of discrimination, judgment was entered in favor of the Commonwealth. The United States appeals from that judgment; the Board cross-appeals the judgment against it.
 
 II. The Legal Standards
 
 10
 Title VII directly protects employees from adverse employment actions on the basis of religion:
 
 
 11
 (a) It shall be an unlawful employment practice for an employer--
 
 
 12
 (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... religion....
 
 
 13
 42 U.S.C. Sec. 2000e-2(a). The only explicit exception to this prohibition is the narrow exception for "bona fide occupational qualifications." ("BFOQs"). 42 U.S.C. Sec. 2000e-2(e)(1). However, Title VII's definition of religion also contains what may be characterized as an exception:
 
 
 14
 The term "religion" includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.
 
 
 15
 42 U.S.C. Sec. 2000e(j) (emphasis added). Thus, perhaps counterintuitively, if an employer cannot accommodate a religious practice without undue hardship, the practice is not "religion" within the meaning of Title VII.
 
 
 16
 In light of this exception, most Title VII religion cases have turned on the question of whether the employer can demonstrate that it could not accommodate a religious practice without "undue hardship." E.g., Trans World Airlines v. Hardison, 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977); Protos v. Volkswagen, 797 F.2d 129 (3d Cir.), cert. denied 479 U.S. 972, 107 S.Ct. 474, 93 L.Ed.2d 418 (1986); Bhatia v. Chevron U.S.A. Inc., 734 F.2d 1382 (9th Cir.1984); EEOC v. Sambo's, 530 F.Supp. 86, 90 (N.D.Ga.1981). Consistent with this analysis, the United States in its complaint alleged that the defendant School Board had failed "reasonably to accommodate individuals who wear or who seek to wear garb or dress that is an aspect of religious observance." But on appeal, the United States argues this analysis is actually too kind to the defendants because the "reasonable accommodation" requirement has only been applied where an employee's religious practice runs afoul of an otherwise religiously neutral requirement, while the Garb Statute at issue here explicitly discriminates against certain practices because they are religious. In such a situation, plaintiff argues that only the much narrower BFOQ exception should apply.
 
 
 17
 This argument runs counter to a straightforward reading of the statute. Since the reasonable accommodation/undue hardship exception is contained within the definition of religion, it must be applied at the threshold of the court's analysis. The import of the statute is clear: if public schools cannot accommodate the wearing of religious garb without undue burden, then the wearing of such garb is not "religion" within the meaning of Title VII. Thus, the district court correctly concluded that a determination of the undue hardship question was required.
 
 
 18
 Once a plaintiff-employee has demonstrated that a religiously motivated practice conflicts with an employment requirement, the employer may defend in one of two ways. First, the employer may demonstrate that it has offered a "reasonable accommodation." In Ansonia Board of Educ. v. Philbrook, 479 U.S. 60, 107 S.Ct. 367, 93 L.Ed.2d 305 (1986), the Supreme Court held that the employer need only demonstrate that the proffered accommodation is reasonable, not that it is the most reasonable or the employee's preferred accommodation. "Thus, where the employer has already reasonably accommodated the employee's religious needs, the statutory inquiry is at an end. The employer need not further show that each of the employee's alternative accommodations would result in undue hardship." Id. at 68, 107 S.Ct. at 372.
 
 
 19
 In this case, however, the defendants proffered no accommodation. Instead, they have pursued the second potential line of defense: they have argued that the accommodation Reardon sought--allowing her to teach in religious garb--could not be accomplished without undue hardship.[1] The plaintiff has not argued that alternative means of accommodation are available. Thus, the issue has been joined on the question of whether the School Board could have allowed Reardon to teach in religious garb without suffering undue hardship.
 
 
 20
 In Trans World Airlines v. Hardison, 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977), the Supreme Court held that "[t]o require [the employer] to bear more than a de minimis cost in order to [accommodate the employee's religious practice] is an undue hardship." Id. at 84, 97 S.Ct. at 2277; see also Ansonia Board of Education, 479 U.S. at 67, 107 S.Ct. at 371; Protos, 797 F.2d at 133. The sort of "de minimis cost" addressed in previous cases has usually been economic in nature. In Hardison, for example, where an employee refused to work on Saturdays for religious reasons, the Court agreed that the employer should not be required to pay premium overtime pay to other workers to induce them to replace the plaintiff on a Saturday shift. 432 U.S. at 63, 97 S.Ct. at 2266. In Protos, also involving a worker who observed Saturday Sabbath, in finding that accommodation would not work an undue hardship, this Court deferred to the district court's weighing of evidence as to whether accommodation would result in diminished efficiency on the assembly line. 797 F.2d at 134-35.
 
 
 21
 Hardison did, however, recognize an arguably non-economic burden when it held that the employer could not be required to violate the seniority provisions of a collective bargaining agreement in order to ensure that plaintiff would not have to work on Saturdays. 432 U.S. at 79-83, 97 S.Ct. at 2274-76. See also EEOC v. Townley Engineering & Mfg. Co., 859 F.2d 610, 615 (9th Cir.1988) ("Townley is, of course, right when it says, 'Cost cannot always be measured in terms of dollars.' "), cert. denied --- U.S. ----, 109 S.Ct. 1527, 103 L.Ed.2d 832 (1989). While one could probably articulate an economic burden suffered by an employer forced to violate a collective bargaining agreement, the Court did not attempt to do so; rather, the opinion stressed the strong national labor policy favoring enforcement of collective bargaining agreements, id. 432 U.S. at 79, 97 S.Ct. at 2274, and the unfairness that would result from requiring employees who have obtained seniority to work on Saturdays when they had "strong, but perhaps nonreligious, reasons for not working on weekends." Id. at 81, 97 S.Ct. at 2275.
 
 III. Cooper v. Eugene School District
 
 22
 Before turning to our legal analysis of the facts of this case, we must take note of Cooper, a case factually indistinguishable from ours that found its way to the Supreme Court of the United States. Cooper upheld the validity of a pair of Oregon statutes whose cumulative import is nearly identical to the Pennsylvania Garb Statute.[2]
 
 
 23
 In accordance with her religious beliefs, Janet Cooper, a Sikh, wore white clothes and a white turban while teaching, even after being warned about the Oregon statutes. As a result she was suspended and her teaching certificate was revoked; in response she filed suit in state court arguing that the statute and the actions taken pursuant to it violated her right to free exercise of her religion. She achieved a short-lived victory in the Oregon Court of Appeals, but the Oregon Supreme Court reversed, reasoning that while the Oregon statutes did constitute a burden on Cooper's free exercise rights, when properly construed the statutes were narrowly tailored to the compelling state interest in preserving the appearance of religious neutrality in public schools. In so holding, the Cooper court did not conclude that tolerating religious garb in the classroom would violate the establishment clause, but rather that "a rule against such religious dress is permissible to avoid the appearance of sectarian influence, favoritism, or official approval in the public school. The policy choice must be made in the first instance by those with lawmaking or delegated authority to make rules for the schools." 723 P.2d at 308.
 
 
 24
 At the time Cooper was decided, such cases were appealable as of right to the United States Supreme Court, and Cooper elected to take such an appeal. Her jurisdictional statement presented four questions:
 
 
 25
 1. Whether the [Oregon statutes] impermissibly infringe on appellant's right to the free exercise of her religious belief in violation of the First Amendment of the Constitution of the United States, or is the statutory proscription against wearing of religious dress mandated by the establishment clause of the First Amendment.
 
 
 26
 2. Whether the statutes in question are invalid because impermissibly vague or overly broad.
 
 
 27
 3. Whether the application of the statutes to appellant deny her the equal protection of the laws, in violation of the Fourteenth Amendment....
 
 
 28
 4. Whether the statutes in question violate Title VII of the Civil Rights Act of 1964 and are thus invalid.
 
 
 29
 The Supreme Court dismissed Cooper's appeal for want of a substantial federal question.
 
 
 30
 Summary dispositions by the Supreme Court of appeals by right have the controlling effect of Supreme Court precedent with regard to "the specific challenges presented in the statement of jurisdiction," Mandel v. Bradley, 432 U.S. 173, 176, 97 S.Ct. 2238, 2240, 53 L.Ed.2d 199 (1977) (per curiam), assuming, of course, that there have been no subsequent doctrinal changes that cast doubt on the continued vitality of the holding.[3] However, "[a] summary disposition affirms only the judgment of the court below, and no more may be read into [the Supreme Court's] action than was essential to sustain that judgment." Anderson v. Celebrezze, 460 U.S. 780, 785 n. 5, 103 S.Ct. 1564, 1568 n. 5, 75 L.Ed.2d 547 (1983). Thus, "judges of the state and federal systems are on notice that, before deciding a case on the authority of a summary disposition by this Court in another case, they must (a) examine the jurisdictional statement in the earlier case to be certain that the constitutional questions presented were the same and, if they were, (b) determine that the judgment in fact rests upon decision of those questions and not even arguably upon some alternative nonconstitutional ground. The judgment should not be interpreted as deciding the constitutional questions unless no other construction of the disposition is plausible." Mandel, 432 U.S. at 180, 97 S.Ct. at 2242 (Brennan, J., concurring). See generally R. Stern, E. Gressman & S. Shapiro, Supreme Court Practice 247-51 (6th ed. 1986).
 
 
 31
 In Lecates v. Justice of Peace Court No. 4, etc., 637 F.2d 898 (3d Cir.1980), this court reviewed the various Supreme Court pronouncements on the precedential value of appeals dismissed and concluded that caution must be exercised to avoid reading more into these summary dispositions than is warranted: "In short, ... the precedential value of a summary disposition by the Supreme Court is to be confined to the exact facts of the case and to the precise question posed in the jurisdictional statement." Id. at 904. Thus, we must be careful to focus solely on the jurisdictional statement and those issues necessarily decided by the Supreme Court in sustaining the Oregon judgment in Cooper, resolving any uncertainty about the scope of the Court's decision in favor of the narrowest possible construction.
 
 
 32
 Janet Cooper did in her jurisdictional statement raise the question of whether the Oregon statutes violated Title VII, and she had raised the issue in the Oregon courts as well. The Oregon Supreme Court expressly declined to reach the issue, however, noting in part that Cooper's teaching certificate had been conditionally reinstated during the course of the litigation. 723 P.2d at 305 n. 9. While we do not fully understand the Cooper court's justification for failing to reach this issue, given that court's approach we believe this is a case in which the Supreme Court "arguably" may have disposed of the Title VII issue other than on its merits.
 
 
 33
 Nonetheless, the summary disposition of Cooper does offer us substantial guidance on the question currently before us because it must be taken as an authoritative approval of the Oregon Supreme Court's disposition of Cooper's free exercise clause claim, and because certain conclusions inevitably flow from that approval. The free exercise claim was fully addressed in the Oregon Supreme Court's opinion and was properly set forth in the jurisdictional statement. The United States Supreme Court could not have decided to dismiss for want of a substantial federal question without concluding that Cooper's free exercise claim was without merit.
 
 
 34
 Government actions specifically directed at religion that burden an individual's free exercise of religion can only be sustained if they are narrowly tailored to a compelling state interest. Sherbert v. Verner, 374 U.S. 398, 403, 83 S.Ct. 1790, 1793, 10 L.Ed.2d 965 (1963); see also Thomas v. Review Board of Indiana Employment Security Division, 450 U.S. 707, 718, 101 S.Ct. 1425, 1432, 67 L.Ed.2d 624 (1981).[4] Accordingly, Cooper's free exercise claim could only have been rejected for one of two reasons: (1) the statutes did not burden her free exercise of religion; or (2) the statutes were not narrowly tailored to serve a compelling state interest. In neither Cooper nor the instant case has any party contended that religious garb statutes do not burden the free exercise of religious beliefs, and such a contention could not be seriously maintained. Therefore, we have no trouble concluding Cooper stands for the proposition that the Oregon statutes permissibly advance a compelling interest in maintaining the appearance of religious neutrality in the public school classroom.[5]
 
 
 35
 This conclusion relieves us from the need to determine with precision the meaning of "undue hardship" under Title VII when applied to non-economic burdens. The Supreme Court's opinion in Hardison strongly suggests that the undue hardship test is not a difficult threshold to pass; at the very least, undue hardship is a lower standard than compelling state interest. Put differently, forcing an employer to sacrifice a compelling state interest would undeniably constitute an undue hardship. Accordingly, it necessarily follows from Cooper that the Oregon statutes do not violate Title VII.
 
 
 36
 As discussed below, the United States seeks to distinguish Cooper on the ground that the Oregon Supreme Court provided a construction of the Oregon statutes which eliminated potential constitutional problems. Further reference to the opinion of the Oregon Supreme Court is therefore appropriate. The Supreme Court of Oregon identified the concern addressed by the statutes as the fear "that the teacher's appearance in religious garb may leave a conscious or unconscious impression among young people and their parents that the school endorses the particular religious commitment of the person whom it has assigned the public role of teacher." 723 P.2d at 313. The court identified the objective of the statutes as the preservation of an "atmosphere of religious neutrality." Id.
 
 
 37
 In accordance with this concern and objective, the Supreme Court of Oregon interpreted the phrase " 'while in the performance of his duties as a teacher' to include only those duties which systematically bring the teacher, as a teacher, into contact with students." Id. at 312. The court also observed that the offending dress is dress that communicates to the teacher's students adherence to a religion, noting that this would not include dress that communicates an ambiguous message, such as, for example, the occasional wearing of jewelry that incorporates common decorations like a cross or a Star of David. Finally, the court pointed out that since the objective of the statutes is the preservation of an atmosphere of neutrality it would not be violated by an isolated occurrence such as the appearance of the teacher "in religious dress ... on her way to or from a seasonal ceremony." Id.
 
 IV. The Claim Against the Board
 
 38
 From the inception of this case, the School Board has insisted that it had no choice but to comply with the Garb Statute.[6] On its face, that statute appeared to be an act of the Pennsylvania legislature duly adopted in 1895 and duly reenacted with minor changes in 1949 as a part of Pennsylvania's Public School Code. 24 Pa.St.Ann. Sec. 1-101 et seq. There was judicial authority in Pennsylvania, Commonwealth v. Herr, 229 Pa. 132, 78 A. 68 (1910), and, as we have seen, a summary disposition by the United States Supreme Court supporting its constitutionality. Accordingly, there was no assurance that the prosecutorial authorities in Pennsylvania would not enforce the statute against school administrators who failed to carry out the dictates of the statute. For the Board to have accommodated Ms. Reardon, it would have been required to expose its administrators to a substantial risk of criminal prosecution, fines, and expulsion from the profession. This, the Board insists, would have been an undue hardship on it as it went about the business of running a school district. We agree.[7]
 
 
 39
 If, as held in Hardison, it is an undue hardship on an employer to require it to violate its collective bargaining agreement by exposing its senior employees to weekend work, we think it follows a fortiori that it would be an undue hardship to require a school board to violate an apparently valid criminal statute, thereby exposing its administrators to criminal prosecution and the possible consequences thereof. The sparse case law addressed to analogous issues provides support for this conclusion. Cf. Bhatia v. Chevron U.S.A. Inc., 734 F.2d 1382, 1384 (9th Cir.1984) (company policy promulgated to avoid risk of liability under state safety standards justified requiring employee to shave facial hair despite contrary religious beliefs); EEOC v. Sambo's, 530 F.Supp. 86, 89-90 (N.D.Ga.1981) (refusal to allow beard in compliance with state health guidelines).
 
 
 40
 We need not, and do not, here address the situation in which there are sufficient indicia of the unconstitutionality of a criminal statute that the chances of enforcement are negligible and accommodation involves no realistic hardship. Nor do we here address the situation in which the defendant is a government entity with the authority to make decisions concerning the constitutionality of state statutes and, in accordance with such a decision, to control whether or not enforcement actions will be brought.[8]
 
 
 41
 Because accommodating Ms. Reardon's desire to express her religious commitment through her attire would have imposed undue hardship on the School Board, the judgment against it must be reversed.
 
 V. The Case Against the Commonwealth
 
 42
 The case against the Commonwealth of Pennsylvania stands on a somewhat different footing than the case against the Board which we have heretofore discussed. We agree with the district court's conclusion that the Commonwealth was not Reardon's "employer" within the meaning of Title VII. While the Commonwealth does in various ways exercise control over the terms of employment of public school teachers, this control is exercised exclusively in its regulatory capacity rather than in the course of a customary employer-employee relationship. See George v. New Jersey Board of Veterinary Medical Examiners, 635 F.Supp. 953, 956 (D.N.J.1985), aff'd, 794 F.2d 113 (3d Cir.1986). Accordingly, the Commonwealth cannot be liable to Ms. Reardon for religious discrimination under 42 U.S.C. Sec. 2000e-2(a).
 
 
 43
 However, the Commonwealth is potentially liable under a provision allowing the Attorney General to seek injunctions against any action by any person that would result in future violations of Title VII:
 
 
 44
 Whenever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured by this subchapter, and that the pattern or practice is of such a nature and is intended to deny the full exercise of the rights herein described, the Attorney General may bring a civil action in the appropriate district court ... requesting such relief, including an application for a permanent or temporary injunction, restraining order or other order against the person or persons responsible for such pattern or practice, as he deems necessary to insure the full enjoyment of the rights herein described.
 
 
 45
 42 U.S.C. Sec. 2000e-6(a) (emphasis added). One need not be the employer of the employees whose Title VII rights are endangered in order to be liable under this section, but the Attorney General must demonstrate the existence of a "pattern or practice" in order to obtain the prophylactic relief provided. In the instant case the district court held that in light of evidence that the Garb Statute was sporadically enforced at best the Commonwealth had not engaged in a "pattern or practice" within the meaning of the statute.
 
 
 46
 The district court concluded that the Supreme Court's opinion in International Bd. of Teamsters v. United States, 431 U.S. 324, 336, 97 S.Ct. 1843, 1854, 52 L.Ed.2d 396 (1977), places a high burden of proof on the Attorney General to demonstrate a consistent history of violation of Title VII. In International Bd. of Teamsters, the Court stated that the plaintiff in a Sec. 2000e-6 claim must "establish by a preponderance of the evidence that ... discrimination was the defendant's standard operating procedure--the regular rather than the unusual practice." Id. International Bd. of Teamsters, however, was a case in which the defendants denied that the practice in question was occurring at all, let alone pursuant to an admitted policy. Where the allegedly discriminatory policy is openly declared--in this case it was, amongother things, published in the Pennsylvania Code--then proof that the policy was actually being followed consistently is not necessary in order to obtain an injunction against subsequent implementation. Cf. United States v. Gregory, 871 F.2d 1239, 1243 (4th Cir.1989) ("[I]f admissions [as to existence of a policy] are credited, the Title VII violation had been proven."), cert. denied --- U.S. ----, 110 S.Ct. 720, 107 L.Ed.2d 740 (1990). In short, if the Garb Statute in itself represents a policy in conflict with Title VII, then the district court erred in failing to enjoin the Commonwealth from enforcing that statute. It thus becomes relevant whether enforcement of the Garb Statute would be consistent with Title VII or, stated conversely, whether accommodation by the Commonwealth of Ms. Reardon's religious expression would impose an undue hardship on it.[9] It is with respect to this issue that the Supreme Court's holding in Cooper has its most direct application in this case.
 
 
 47
 It is apparent from the face of the Pennsylvania Garb statute and from the only Pennsylvania case construing it that its objective is the same as that of the statutes upheld in the Cooper case. Commonwealth v. Herr, 229 Pa. 132, 78 A. 68, 73 (1910) ("As shown by the preamble of the Act under consideration, the Legislature deemed it 'important that all appearances of sectarianism should be avoided in the administration of public schools of the commonwealth.' This was the ostensible object of the legislation, and we can discover no substantial ground for concluding that it was not the sole object which the Legislature had in contemplation.") As we have indicated, the Supreme Court's dismissal of the appeal in Cooper authoritatively establishes that this objective, i.e., the preservation of an atmosphere of religious neutrality, is a compelling state interest. We have also demonstrated that Cooper authoritatively establishes that the Oregon statutes do not violate Title VII. If the Pennsylvania statute, like the Oregon statutes in Cooper, is narrowly tailored to serve that compelling state interest, then by the same reasoning it too must pass Title VII muster.
 
 
 48
 It is true, as the United States stresses, that the Oregon Supreme Court construed the statutes before it so as to limit their application to situations that implicate the concerns addressed by the statute. At the same time, however, it is also true that the text of the Pennsylvania statute is as narrowly tailored to its objective as the texts of the Oregon statutes are to theirs. Given the text of the Pennsylvania statute and its objective, we think it highly unlikely that the Supreme Court of Pennsylvania would construe the statute in a manner that would make it offensive to the Court that found no substantial federal question in Cooper.[10]
 
 
 49
 Moreover, even were we to assume that the Pennsylvania statute might possibly be found to have borders somewhat wider than those of the Oregon statutes, we would nevertheless conclude that the United States has not shown a pattern or practice of resistance by the Commonwealth. In the absence of evidence showing prosecution in situations not sanctioned by Cooper, the speculative existence of a penumbra of situations in which the Pennsylvania Garb State might apply where the Oregon statutes would not, combined with the speculative possibility that this penumbra of situations would be in conflict with Title VII, does not satisfy the requirement of a "pattern or practice" within the meaning of 42 U.S.C. Sec. 2000e-6(a). Accordingly, while we disagree with the district court's analysis, we agree with its conclusion.
 
 VI. The Relevance of Anti-Catholic Animus
 
 50
 In reaching these conclusions, we have not been unmindful of the district court's finding in the present case that "anti-Catholicism was a significant factor in the passage of the Pennsylvania religious garb bill of 1895, now codified as section 11-1112." District Court Findings of Fact p 143. A similar contention was raised in Cooper, and in fact the Oregon Supreme Court agreed that considerable anti-Catholic sentiment surrounded the original enactment of the Oregon statutes in 1923, 723 P.2d at 308; however, the Cooper court dismissed this issue by noting that the legislature reenacted the statutes in 1965 in an atmosphere untainted by hostility to any sect, motivated purely by its desire "to maintain the religious neutrality of the public schools, to avoid giving children or their parents the impression that the school, through its teacher, approves and shares the religious commitment of one group and perhaps finds that of others less worthy." Id. As we have noted, the Pennsylvania Garb Statute was similarly reenacted as part of Pennsylvania's Public School Code of 1949. 24 Pa.St.Ann. Secs. 1-101 et seq. However, the parties in this case tendered no evidence, and the district court made no finding, regarding the circumstances surrounding the reenactment of the statute in 1949.
 
 
 51
 Since we have already concluded that the School Board has a valid undue hardship defense regardless of the ultimate validity of the Garb Statute, the allegedly impermissible motivation behind that statute is irrelevant to our decision with regard to that defendant. Even if the School Board had had some reason, not reflected in this record, for being suspicious of the motives of the legislature in 1895, we believe that requiring it to litigate over that motivation would itself constitute an undue hardship.
 
 
 52
 However, we must still consider whether the putatively anti-Catholic motivation behind the Garb Statute is of any greater significance in the context of the case against the Commonwealth. Accepting for the sake of argument the district court's finding of fact that "anti-Catholicism was a significant factor" in the passage of the statute, we conclude that this fact is irrelevant to this Title VII suit against the Commonwealth.
 
 
 53
 Pennsylvania's Garb Statute was passed on the heels of the decision of the Supreme Court of Pennsylvania in Hysong v. Gallitzin, 164 Pa. 629, 30 A. 482 (1894) which held that there was no barrier to garbed Catholic nuns and priests teaching in the public schools. The district court apparently concluded that anti-Catholicism was "a significant factor" in the passage of the Garb Statute because the legislature, or at least portions thereof, favored its passage in order to bar Catholic habit from the classrooms of the public school system.
 
 
 54
 We need not here address what if any importance this "significant factor" finding would have in the context of an establishment clause challenge to the statute; we have no such challenge before us. The Garb Statute plays a role in this litigation only because the Commonwealth asserts that it would be an undue hardship upon its public school system to require it to permit teachers to wear religious attire as they teach. The Garb Statute is significant solely because it evidences a decision on the part of the Commonwealth that barring religious attire is important to the maintenance of an atmosphere of religious neutrality in the classroom.
 
 
 55
 In this context, where the statute bans all religious attire and is being enforced by the Commonwealth in a non-discriminatory manner with respect to the Muslim teachers as well as Catholics, we conclude that it is irrelevant whether a portion of those who voted for the statute in 1895 were motivated by a desire to bar Catholic habit from the classroom. We therefore accept that the Commonwealth regards the wearing of religious attire by teachers while teaching as a significant threat to the maintenance of religious neutrality in the public school system, and accordingly conclude that it would impose an undue hardship to require the Commonwealth to accommodate Ms. Reardon and others similarly situated.
 
 VII. Conclusion
 
 56
 For these reasons, we will reverse the district court's judgment against the defendant School Board and instruct that judgment be entered in its favor. We will affirm the judgment in favor of the defendant Commonwealth of Pennsylvania.
 
 
 57
 HAROLD A. ACKERMAN, District Judge, concurring in judgment.
 
 
 58
 I respectfully concur in the judgment of the court.
 
 
 59
 I agree with the majority that the issue of main concern is whether the School Board could have accommodated[1] Ms. Reardon to teach in her religious garb without the Board suffering undue hardship--an issue under Title VII. See majority opinion, at 888. I agree with the majority that undue hardship may be a non-economic burden placed on an employer. Id. at 889. After that, we part company. Herein, I first will explain why I disagree with the majority's reasoning and, second, I will put forth my view as to the disposition of these appeals.
 
 
 60
 * The majority's thorough opinion, after the background and exposition of the governing law, essentially breaks down to individual analyses of the liability of the two defendants, the Board of Education and the Commonwealth of Pennsylvania. With respect to the defendant Board's liability, the majority concludes,
 
 
 61
 From the inception of this case, the School Board has insisted that it had no choice but to comply with the Garb statute. On its face, that statute appeared to be an act of the Pennsylvania legislature duly adopted in 1895 and duly reenacted with minor changes in 1949 as part of Pennsylvania's Public School Code. 24 Pa.St.Ann. Sec. 1-101 et seq. There was judicial authority in Pennsylvania, Commonwealth v. Herr, 229 Pa. 132, 78 A. 68 (1910), and, as we have seen, a summary disposition by the United States Supreme Court supporting its constitutionality. Accordingly, there was no assurance that the prosecutorial authorities in Pennsylvania would not enforce the statute against school administrators who failed to carry out the dictates of the statute. For the Board to have accommodated Ms. Reardon, it would have been required to expose its administrators to a substantial risk of criminal prosecution, fines, and expulsion from the profession. This, the Board insists, would have been undue hardship on it as it went about the business of running a school district. We agree.
 
 
 62
 Majority opinion, at 890-891 (footnotes omitted). Hence, the majority holds that the Board did not violate Title VII because the instant accommodation would have caused it undue hardship.
 
 
 63
 With respect to the Commonwealth, the majority observes that the Commonwealth may be potentially liable under the "policy or practice" clause of Title VII, unless enforcement of the garb statute would be consistent with Title VII. Majority opinion, at 893-894. To pass Title VII muster, the majority reasons that the Commonwealth must suffer undue hardship--i.e., be barred from its compelling state interest in enforcing the garb statute--if the accommodation took place. Utilizing the authority of Cooper v. Eugene School District No. 4J, 301 Or. 358, 723 P.2d 298 (1986), appeal dismissed, 480 U.S. 942, 107 S.Ct. 1597, 94 L.Ed.2d 784 (1987), the majority explains:
 
 
 64
 As we have indicated, the Supreme Court's dismissal in Cooper authoritatively establishes that this objective, i.e., the preservation of an atmosphere of religious neutrality, is a compelling state interest. We have also demonstrated that Cooper authoritatively establishes that the Oregon statutes do not violate Title VII. If the Pennsylvania statute, like the Oregon statutes in Cooper, is narrowly tailored to serve that compelling state interest, then by the same reasoning it too must pass Title VII muster.
 
 
 65
 Majority Opinion, at 893. The majority states that the Pennsylvania statute is as narrowly tailored as the Oregon statute is, and, thus, serves the compelling state interest. In view of this analysis, the majority determines that the statute passes Title VII muster. Id. As a secondary position, the majority indicates that the United States has not shown a pattern or practice of resistance by the Commonwealth. The majority takes the possible cases outside the scope of the Oregon statute (which it deems to be few and speculative), combines this with the unlikely probability that these occurrences would be in conflict with Title VII, and concludes that the product of these two improbable factors could not equal a "pattern or practice." Accordingly, the majority agrees with the district court's ruling concerning the Commonwealth of Pennsylvania.
 
 
 66
 There are two premises (one underlying the majority's ruling with respect to the Board and one underlying the majority's ruling with respect to the Commonwealth) that I do not agree with. First, with respect to the Board, the majority holds that the specter of penal sanction hanging over the heads of the Board's agents for non-enforcement of the garb statute is undue hardship. I do not accept this premise because there is little in the record to indicate that the penal section of the Pennsylvania garb statute was being enforced. I simply do not believe that undue hardship can arise from a non-event, although, concededly, it may arise from a non-economic burden. Moreover, the majority's rule, in view of the non-enforcement, provides the precedential material from which wily legislatures could effectively insulate like statutes from review merely by appending a like, unused section providing sanctions to the statute. Accordingly, I do not agree with the majority's reasoning regarding the Board's liability.
 
 
 67
 Second, with respect to the majority's ruling regarding the Commonwealth, the majority's reliance on Cooper is simply in error for a number of reasons. Initially, I do not accept the majority's reliance on the United States Supreme Court's dismissal of the appeal in Cooper. The foremost academic authority on United States Supreme Court practice, Messrs. Stern, Gressman, and Shapiro, have explained that the lower courts should exercise caution in affording Supreme-Court summary action precedential value. In their treatise, they observed that:
 
 
 68
 [t]he lower court judges, in other words, must make intensive inquiries into the factual and constitutional bases of the earlier decisions summarily approved by the Supreme Court. Only if the facts involved in the earlier decisions are not "very different" from those presently under consideration, and only if the earlier decisions rested solely on established constitutional principles and did not break any new ground, can the summary actions of the Supreme Court be safely followed. To perform this concentrated type of inquiry, the lower court judges must have before them most if not all of the appeal papers in the earlier proceedings, and must not rely too much on the rationale expressed in the lower court opinions in earlier cases. It is not too surprising that some lower court judges and many members of the bar find this approach to prior Supreme Court summary actions both difficult and hazardous to follow.
 
 
 69
 R. Stern, E. Gressman & S. Shapiro, Supreme Court Practice Sec. 4.30, at 251 (6th ed. 1986); see Zobel v. Williams, 457 U.S. 55, 64 n. 13, 102 S.Ct. 2309, 2315 n. 13, 72 L.Ed.2d 672 (1982) ("summary affirmance by this Court is not to be read as an adoption of the reasoning supporting the judgment under review"). Restated, before a lower court utilizes the United States Supreme Court's dismissal of the appeal as authority, it must, as a matter of prudence and caution, (1) be sure to have examined the whole record of the earlier action and (2) be sure that this decision did not break any new ground. In the instant action, we do not have the full appellate record in Cooper before us. At best, we only have the jurisdictional statement of appellant Cooper to the United States Supreme Court with five attachments: (1) the Oregon Supreme Court's decision; (2) the Oregon Court of Appeals decision; (3 & 4) the proposed findings of fact and conclusions of law of the two administrative hearing officers; and (5) the notice of appeal to the United States Supreme Court. Without analyzing the full record, I am extremely hesitant to give Cooper any more weight than this panel would accord decisions from other state appellate-court panels.
 
 
 70
 Moreover, according Cooper the reading that the majority would give it, would be to say that, in dismissing Ms. Cooper's appeal, the United States Supreme Court concluded that garb statutes like the Oregon act do not offend the free-exercise clause because they further the state's compelling interest in not endorsing a particular religion over any other, or in not endorsing religion over nonreligion. I believe that such a ruling concerning garb statutes would be a first from the Court, thus breaking new ground. I therefore believe that the Court would not agree with such formulation absent a full decision from it, particularly in this area where free-exercise rights may be in tension with the establishment clause. Thus, I cannot accept the majority's reading of Cooper for this reason, too.
 
 
 71
 Let me also note that I am somewhat puzzled by the way the majority utilizes Cooper in this case. The instant case is a Title VII case. At one point in their opinion, the majority explains the relationship between Cooper and Title VII, stating,
 
 
 72
 Janet Cooper did in her jurisdictional statement raise the question of whether the Oregon statutes violated Title VII, and she had raised the issue in the Oregon courts as well. The Oregon Supreme Court expressly declined to reach the issue, however, noting in part that Cooper's teaching certificate had been conditionally reinstated during the course of the litigation. 723 P.2d at 305 n. 9. While we do not fully understand the Cooper court's justification for failing to reach this issue, given that court's approach we believe this is a case in which the Supreme Court "arguably" may have disposed of the Title VII issue other than on the merits.
 
 
 73
 Majority opinion, at 889. In other words, the majority is stating that Cooper cannot stand for the proposition that the Oregon garb statute did or did not violate Title VII. Yet, two pages later, the majority concludes that "it necessarily follows from Cooper that the Oregon statutes do not violate Title VII." Id. at 890. So, in essence, the majority states that while Cooper did not speak directly to Title VII, the reasoning in Cooper imports that Title VII would not be violated by the garb statute.
 
 
 74
 I have two distinct concerns with the court's logic in this regard. First, pragmatically, if the reasoning in Cooper indeed imported that Title VII was not violated, then could not the Oregon Court have reached the same conclusion about the Oregon garb statute and Title VII that the majority does here? After all, the Title VII issue and the Oregon Court's reasoning about the other issues in Cooper were in that court's grasp. Yet, the Oregon court chose not to write on the Title VII issue. Thus, I consider the majority's reasoning predicated on Cooper to be on uncertain ground in view of the Oregon court's silence on the issue.
 
 
 75
 Second, it is fair to say that the majority's use of Cooper rests on the following line of reasoning: (1) the first-amendment free-exercise claim was fully addressed in Cooper, see majority opinion, at 890; (2) the Supreme Court rejected Ms. Cooper's free-exercise claim; (3) there are only two grounds for such rejection--(a) the statutes did not burden Ms. Cooper's free exercise of religion, or (b) the statutes were narrowly tailored to serve a compelling state interest, see id. at 890; (4) there is no doubt that the Oregon statutes were a burden on free exercise; (5) therefore, "Cooper stands for proposition that the Oregon statutes permissibly advance a compelling interest in maintaining the appearance of religious neutrality in the public school classroom" id. at 889; and, thus, (6) forcing the Commonwealth to order accommodation would cause undue hardship because in so doing the Commonwealth would have to forsake a compelling state interest, see id. at 893-894. My view is that I would not rely on Cooper for the proposition that implementation of the garb statute furthers a compelling state interest under the first amendment because such a reading of Cooper is a strained one. After all, in Cooper, the Oregon court defined the issues before them as being issues under the Oregon constitution, not the federal constitution, see 723 P.2d at 306, and in the body of the opinion, made reference only to Oregon constitutional precepts, although sometimes drawing on federal law. See id. at 306-13. Also, the Oregon Court for the first time in the conclusion of its opinion briefly states that its decision also means that the garb statute does not violate the federal constitution. In view of these two facts from the text of Cooper, I would not rely on Cooper as authority in the instant case.
 
 
 76
 Accordingly, for all of these reasons, I will not accept the majority's reasoning concerning the precedential value of the disposition of the Cooper appeal with respect to the Commonwealth in this case.
 
 II
 
 77
 Having identified the problems with the majority's reasoning, it is incumbent upon me to put forth different reasoning upon which to decide these appeals. I conclude that deciding the appeals in this case boils down to one issue: whether the only accommodation possible by the two state actors in this case (allowing Ms. Reardon to teach in her garb) would cause undue hardship to them because such accommodation would violate the establishment clause of the first amendment to the United States Constitution?
 
 
 78
 The defendants basically contend that this accommodation would cause it hardship because this accommodation would be in violation of the establishment clause of the first amendment. The United States counters, in a nutshell, that the wearing of religious dress or symbols by teachers does not violate the establishment clause unless such wearing is accompanied by "clearly problematic factors," not present here, such as teaching of religion in the classroom. United States' Brief as Cross-Appellee and Reply Brief as Appellant, at 25. The district judge ruled that, under the now-familiar test which the United States Supreme Court first put forth in Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) and which the Court has reiterated many times thereafter, the principal or primary effect of the accommodation would neither advance nor inhibit religion and, thus, would not cause undue hardship. In so ruling, the district court observed that: (1) the state would have no purpose of furthering religion if they accommodated Ms. Reardon; (2) Section 11-1112 was applied sporadically and inconsistently, indicating that the statute was not essential to avoid symbolic state endorsement of religion; (3) the state statute itself was invalid because it was passed based on anti-catholic animus; and (4) there was a lack of evidence in the record of students perceiving the wearing of such garb as indicating state endorsement of religion. The district court therefore concluded that the Board could have reasonably accommodated Ms. Reardon.
 
 
 79
 In Edwards v. Aguillard, 482 U.S. 578, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987), Justice Brennan recently explained the calculus necessary for deciding whether state action violates the establishment clause of the first amendment, stating,
 
 
 80
 [t]he Establishment Clause forbids the enactment of any law "respecting an establishment of religion." The Court has applied a three-pronged test to determine whether legislation comports with hte Establishment Clause. First, the legislature must have adopted the law with a secular purpose. Second, the statute's principal or primary effect must be one that neither advances nor inhibits religion. Third, the statute must not result in an excessive entanglement with religion. Lemon v. Kurtzman, 403 U.S. 602, 612-13 [91 S.Ct. 2105, 2111, 29 L.Ed.2d 745] (1971). State action violates the Establishment Clause if it fails to satisfy any of these prongs.
 
 
 81
 Id., 482 U.S. at 582-83, 107 S.Ct. at 2576-77. I conclude that the district court erred in determining that the proposed accommodation would not have the primary or principal effect of endorsing religion under Edwards and Lemon. I therefore believe that the accommodation would cause the state defendants undue hardship.[2]
 
 
 82
 The United States Supreme Court has explained "endorsement" in County of Allegheny v. American Civil Liberties Union Greater Pittsburgh Chapter, stating,
 
 
 83
 Of course, the word "endorsement" is not self-defining. Rather, it derives meaning from the other words that this Court has found useful over the years in interpreting the Establishment Clause. Thus, it has been noted that the prohibition against governmental endorsement of religion "preclude[s] government from conveying or attempting to convey a message that religion or a particular religious belief is favored or preferred." Wallace v. Jaffree, 472 U.S. [38,] 70, 105 S.Ct. [2479,] 2497 [86 L.Ed.2d 29] (1985)....
 
 
 84
 Whether the key word is "endorsement," "favoritism," or "promotion," the essential principle remains the same. The Establishment Clause, at the very least, prohibits government from appearing to take a position on questions of religious belief or from "making adherence to a religion relevant in any way to a person's standing in the political community." Lynch v. Donnelly, 465 U.S. at 687, 104 S.Ct., at 1366 (O'Connor, J., concurring).
 
 
 85
 --- U.S. ----, 109 S.Ct. at 3086, 3101, 106 L.Ed.2d 472 (1989) (citations omitted in part). Accommodating Ms. Reardon by permitting her to wear her religious garb while she is teaching conveys to her students that the state favors or prefers religion over nonreligion. In the classroom environment, it cannot be gainsaid that a teacher is a powerful influence on children, particularly, as here, young children (elementary-school age). Further, as the record indicates, the wearing of religious garb creates curiosity in the child. It is undisputed that students have asked teachers who wear religious garb about that garb (e.g., district court's findings of fact para. 55). It is a short leap in logic from these facts to conclude that children could, in the exercise of their curiosity, think that a school is favoring religion per se to the detriment of nonreligion by permitting Ms. Reardon to wear her religious apparel. In fact, as the district court noted, the defendants' expert testified that there was a possibility that the wearing of religious garb by a teacher could be seen by the students as an endorsement of religion by the state or the school district.[3] Moreover, since the wearing of such garb occurs in the intense and "captive" classroom atmosphere, this would further enhance the "symbolic connection" between religion and the state. See Grand Rapids School District v. Ball, 473 U.S. 373, 390-91, 105 S.Ct. 3216, 3226-27, 87 L.Ed.2d 267 (1985) (comparing McCollum v. Board of Education, 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948) with Zorach v. Clauson, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952)). In view of a child's delicate constitution and curiosity, the testimony by the defendants' expert concerning the children's possible conclusion of endorsement, the fact that the students did indeed ask particular teachers about their garb (indicative of a child's curiosity), and the atmosphere where the garb is worn, it is clear to me that the sought-after accommodation would have the effect of the state appearing to endorse religion over nonreligion.[4]
 
 
 86
 This effect, of course, is prohibited under the establishment clause. See Texas Monthly, Inc. v. Bullock, 489 U.S. 1, 109 S.Ct. 890, 896, 103 L.Ed.2d 1 (1989) ("It is part of our settled jurisprudence that 'the Establishment Clause prohibits government from abandoning secular purposes in order to put an imprimatur on one religion, or on religion as such, or to favor the adherents of any sect or religious organization,' " quoting Gillette v. United States, 401 U.S. 437, 450, 91 S.Ct. 828, 836, 28 L.Ed.2d 168 (1971)); see also Board of Education of the Westside Community Schools v. Mergens, --- U.S. ----, ---- - ----, 110 S.Ct. 2356, 2372-73, 110 L.Ed.2d 191 (1990) (O'Connor, J., White, J., Blackmun, J., and Rehnquist, C.J.) and --- U.S. at ----, 110 S.Ct. at 2378 (Brennan, J. and Marshall, J., concurring) (the establishment clause proscribes public schools from "conveying a message 'that religion or a particular religious belief is preferred.' "). Time and time again, the United States Supreme Court has expressed particular concern over the power of the state public schools to influence the child with respect to religion. See Edwards, 482 U.S. at 584, 107 S.Ct. at 2577, where Justice Brennan, writing for the majority, explained that
 
 
 87
 [f]amilies entrust public schools with the education of their children, but condition their trust on the understanding that the classroom will not purposely be used to advance religious views that may conflict with the private beliefs of the student and his or her family. Students in such institutions are impressionable and their attendance is involuntary.... The State exerts great authority and coercive power through mandatory attendance requirements, and because of the student's emulation of teachers as role models and the children's susceptibility to peer pressure.
 
 
 88
 Id. at 584, 107 S.Ct. at 2577 (citations omitted) (footnotes omitted). See also Grand Rapids School District v. Ball, 473 U.S. 373, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985), where Justice Brennan again wrote for the majority,
 
 
 89
 [t]he inquiry into [endorsement] must be conducted with particular care when many of the citizens perceiving the governmental message are children in their formative years.... The symbolism of a union between church and state is most likely to influence children of tender years, whose experience is limited and whose beliefs consequently are the function of environment as much as of free and voluntary choice.
 
 
 90
 Id. at 390, 105 S.Ct. at 3226 (footnotes omitted) (citations omitted). This same concern influences me here. I, too, have no doubt as to the sincerity of Ms. Reardon's religious beliefs. The first amendment does not proscribe religious beliefs, it protects them. However, preventing subtle inculcation of the message that religion is preferred over nonreligion (irrespective of whether that message is intentional or inadvertent) by forbidding one to teach in public schools while clothed in religious raiment keeps public-school classrooms swathed in constitutional neutrality--their proper philosophical attire.
 
 
 91
 Since the only accommodation possible in the instant case would violate the establishment clause of the First Amendment of the United States Constitution, I believe that the district court erred in finding that no undue hardship would come to the Board were it to implement the accommodation. A violation of the First Amendment would have more than a de minimis effect on the defendant's "business." See Trans World Airlines v. Hardison, 432 U.S. 63, 84, 97 S.Ct. 2264, 2277, 53 L.Ed.2d 113 (1977). Not only would it harm the interests of the children who are essentially the defendants' consumers, but such accommodation could subject the defendant to the costs of litigating a First Amendment suit, in turn detracting from the public fisc used for education.
 
 
 92
 In sum then, since the only accommodation possible in this action would violate the establishment clause,[5] I would conclude that the district court erred in determining that the Board violated Title VII. Further, since the accommodation in this particular instance, and instances like it, would cause undue hardship, I would affirm the judgment of the district court respecting the Commonwealth of Pennsylvania.
 
 
 93
 For these reasons, I respectfully concur in the judgment of the court.
 
 
 
 *
 Honorable Harold A. Ackerman, United States District Judge for the District of New Jersey, sitting by designation
 
 
 [1]
 Amicus Americans United For Separation of Church and State has urged us to reconceptualize this case as presenting a question of the first sort, i.e., by remanding the case for a determination as to whether the School Board could reasonably accommodate Ms. Reardon by offering her employment in a non-teaching position. This suggestion is contrary to the manner in which the parties have quite reasonably chosen to litigate this case. The defendant School Board never offered such an alternative "reasonable accommodation," and Reardon did not force the issue by requesting such an accommodation
 
 
 [2]
 No teacher in any public school shall wear any religious dress while engaged in the performance of duties as a teacher
 Or.Rev.Stat. Sec. 342.650.
 Any teacher violating the provisions of ORS 342.650 shall be suspended from employment by the district school board. The board shall report its action to the Superintendent of Public Instruction who shall revoke the teacher's teaching certificate.
 Or.Rev.Stat. Sec. 342.655.
 
 
 [3]
 We have found no case reflecting a doctrinal shift since Cooper. Shortly after the present case was argued, the United States Supreme Court announced its opinion in Employment Division, Department of Human Resources of Oregon v. Smith, --- U.S. ----, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). In this decision the Court sharply restricted the level of review to be applied in free exercise cases in which plaintiffs seek exemptions from criminal laws of general applicability that are not specifically directed at religious practices. Id. 110 S.Ct. at 1602-03. While the Smith decision may represent a considerable shift in the Court's direction in free exercise jurisprudence, it does not have any impact on our interpretation of the significance of the summary dismissal in Cooper
 By its terms, the Smith decision is restricted to situations where government action is not specifically addressed to religious practice. Id. 110 S.Ct. at 1600. Religious garb statutes are, of course, addressed to certain behavior purely because it is religious in nature. Accordingly, Smith has no bearing on cases concerning such statutes.
 
 
 [4]
 As we have already noted, see supra note 3, the Supreme Court's recent Smith decision does not affect our interpretation of the summary dismissal in Cooper
 
 
 [5]
 We note, perhaps unnecessarily, that Cooper does not stand for the proposition that allowing teachers to wear religious garb in the classroom would violate the establishment clause. While the jurisdictional statement in Cooper seems to have assumed that only the need to avoid an establishment clause violation could constitute a compelling state interest, the Oregon Supreme Court explicitly eschewed this assumption, and recognized that "the decisions generally have been that more than a teacher's religious dress is needed to show a forbidden sectarian influence in the classroom." 723 P.2d at 308. In the present case as well the plaintiff has embraced the assumption that the free exercise clause's protection can only end where the establishment clause's prohibition begins, and has suggested that "the statute should be upheld only if the Commonwealth can show that every time a teacher wear religious garb, there's a violation of the establishment clause." Transcript of Oral Argument at 34. We are not currently presented with an establishment clause case, and for the present purposes we need only note that Cooper does not mean, and we need not conclude, that tolerating religious garb would violate the establishment clause
 
 
 [6]
 While the United States does not contend to the contrary, we note that the School Board reasonably concluded that Ms. Reardon's attire fell within the prohibitions of the Garb Statute. The trial transcript reveals that Reardon's dress was sufficiently unusual that on a number of occasions students asked her about it; on some occasions Muslim students recognized that Reardon's attire identified her as a Muslim. Joint Appendix at 83-85, 89-90. While it is probably unusual that a child would be sufficiently knowledgeable to recognize which religion Reardon's garb identified her as belonging to, it is likely that many children would realize Reardon dressed as she did for religious reasons
 
 
 [7]
 The district court in this case, citing Protos, 797 F.2d at 135 n. 3, concluded that whether an undue hardship has been demonstrated is a question of fact. District Court Opinion at 33 n. 2. The plaintiff accordingly argues that we should defer to the district court's judgment in this regard
 In fact, Protos held only that district court determinations as to undue hardship are findings of fact when the district court determines whether economic burdens on the employer constitute undue hardship under the de minimis standard set forth in Hardison. 797 F.2d at 135 n. 3. The question of whether a particular type of non-economic burden constitutes an undue hardship within the meaning of Title VII is a mixed question of law and fact, and to the extent a question of law is presented, our review is plenary.
 
 
 [8]
 The Board's situation is not one in which an administrative agency has been charged with enforcement of a statute and has concomitant responsibilities to defend that statute in court and ensure that the statute is applied constitutionally. Compare, e.g., 71 Pa.St.Ann. Sec. 732-204(a)(1) & (3) (Attorney General, upon request from any Commonwealth agency, shall furnish binding legal advice on any issue concerning exercise of official powers; Attorney General must defend constitutionality of all statutes); id. at Sec. 352(a) & (d) (Pennsylvania Department of Education has power and duty to administer laws concerning public schools and to give advice on issues relating to school laws). Far from having such responsibilities with regard to the Garb Statute, school administrators are the subjects of the statute. While Pennsylvania's school districts were created by the State and given the powers necessary to fulfill their role, see generally 24 Pa.St.Ann. Secs. 2-201 & 2-211, they have not been given discretion to enforce state laws
 
 
 [9]
 Strictly speaking, the "undue hardship" exception of 42 U.S.C. Sec. 2000e(j) only applies where a burden on "the conduct of the employer's business " is shown. It is therefore somewhat inaccurate to say that the Commonwealth can defend against a "pattern and practice" action, where it is not the employer, by demonstrating that sacrificing the statute would impose and undue hardship on the Commonwealth. Nonetheless, we believe this is the correct inquiry to undertake in the present situation. The Commonwealth will only be guilty of a "pattern or practice of resistance" to Title VII rights if the subject school boards, in obeying the Garb Statute, violate teachers' Title VII rights. We have already held that a school board does not violate Title VII in obeying the statute because the threat of enforcement of the statute in itself constitutes an undue burden. But to conclude that the Garb Statute is not a pattern or practice because it in itself constitutes an undue hardship that protects school boards from Title VII liability would be to countenance a bootstrapping theory that would forestall all protection of Title VII rights in this context. Therefore, we conclude that the Garb Statute would be a "pattern or practice of resistance" if the actions taken in compliance with the statute would violate Title VII if taken independent of the statute. A school board that prevented a teacher from wearing religious attire in a state that has no Garb Statute would be required to demonstrate that tolerating such attire would impose an undue hardship on the conduct of its business. Since the School Board in this case has been relieved of that burden, the onus of doing so falls upon the Commonwealth
 
 
 [10]
 While the Oregon Supreme Court can be described as giving the Cooper statutes a "narrowing" construction, Cooper is not a case where a state Supreme Court, in order to sustain the constitutionality of a state statute, has construed it contrary to its literal language or has added provisions not contemplated by the legislature. The Cooper court simply construed the statute in accordance with its text and purpose. The distinction is of significance here. We are not authorized to engage in the former practice in order to save a state statute. Gooding v. Wilson, 405 U.S. 518, 520, 92 S.Ct. 1103, 1105, 31 L.Ed.2d 408 (1972). On the other hand, we cannot review the constitutionality of a state statute without determining what it requires, and when doing so we are not required to assume that it will be given anything other than a common sense interpretation based on its clear purpose
 
 
 [1]
 Accommodation in this case is simply allowing Ms. Reardon to teach in her garb
 
 
 [2]
 In ruling on the accommodation/undue-hardship issue, the scope of review in the normal case would be a "clearly-erroneous" standard, Protos v. Volkswagen of Am., Inc., 797 F.2d 129, 135 n. 3 (3d Cir.), cert. denied, 479 U.S. 972, 107 S.Ct. 474, 93 L.Ed.2d 418 (1986), because in the usual "undue hardship" case, the determination is one of fact. Id. at 134. The majority observed this point. Majority opinion, at 891 n. 8. It then states that in this context such questions are afforded plenary review because they are mixed questions of law and fact. Id. I agree
 Let me also add that embedded within the undue-hardship question, as I see it, is another question of law--namely, the court's determination of whether the proposed accommodation would pass the Lemon test. As Justice O'Connor wrote in her concurrence in Lynch v. Donnelly, 465 U.S. 668, 693-94, 104 S.Ct. 1355, 1370, 79 L.Ed.2d 604 (1984):
 whether a government activity communicates endorsement of religion is not a question of simple historical fact. Although evidentiary submissions may help answer it, the question is, like the question whether racial or sex-based classifications communicate an invidious message, in large part a legal question to be answered on the basis of judicial interpretation of social facts.
 Accord Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos, 483 U.S. 327, 348, 107 S.Ct. 2862, 2875, 97 L.Ed.2d 273 (1987) (O'Connor, J., concurring); see also County of Allegheny v. American Civil Liberties Union Greater Pittsburgh Chapter, --- U.S. ----, 109 S.Ct. 3086, 3112 n. 60, 106 L.Ed.2d 472 (1989); Smith v. Board of School Commissioners of Mobile County, 827 F.2d 684, 690 n. 4 (11th Cir.1987). Therefore, like the majority, I believe that the issue of accommodation/undue hardship may be reviewed de novo.
 
 
 [3]
 The district judge discredited this assertion because Dr. Landy (the defendants' expert) did not base his view on any studies calculated to assess the impact of religious garb on students and the fact that Dr. Landy and his research team did not conduct any clinical studies. Since review is de novo, I need not accept this conclusion
 
 
 [4]
 An argument could be made that this statute might be read to encompass religious symbols such as a mezuzahs, crucifixes, or mini-Buddhas, etc., worn, for instance, on necklaces. However, a case involving small-sized religious articles is not before this panel. Were such case to come before this court, then, the court would consider that case's specifics in view of Lemon and come to a determination. The difference from the instant case to the next case may simply be one of degree and effect. The United States Supreme Court, through its crafting of the flexible test in Lemon has indicated that it, and the inferior courts, will deal with these factors, making distinctions where appropriate. The articulation of the Lemon test itself demonstrates the Court's confidence in the judiciary's ability to make distinctions. Hence cases involving smaller-sized religious symbols do not affect my analysis here. Their propriety awaits another day
 
 
 [5]
 In opposition to the above reasoning, one might argue that such a ruling impinges on a teacher's free-exercise rights. However, Justice O'Connor, in Wallace v. Jaffree, 472 U.S. 38, 82, 105 S.Ct. 2479, 2503, 86 L.Ed.2d 29 (1985) (concurring in judgment), stated that "judicial deference" to all state action purporting to facilitate the free exercise of religion "would completely vitiate the Establishment Clause. Any [state action] pertaining to religion can be viewed as an 'accommodation' of free exercise rights." Such powerful logic provides a devastating rejoinder to this argument