EQUAL EMPLOYMENT OPPORTUNI-
TY COMMISSION

v.

READS, INC.

Civ. A. No. 88–7406.

United States District Court,
E.D. Pennsylvania.

March 25, 1991.

Issie L. Jenkins and Yolanda R. Hughes, Philadelphia, Pa., for plaintiff.

David L. Marshall, Eastburn & Gray, Doylestown, Pa., for defendant.

## MEMORANDUM AND ORDER

DuBOIS, District Judge.

This is a religious discrimination action, brought by The Equal Employment Opportunity Commission ("EEOC"), pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* Jurisdiction is based on 28 U.S.C. §§ 1331 and 1345.

The EEOC charges that Remedial Educational and Diagnostic Services, Inc. ("READS") failed to hire Cynthia Moore ("Moore") for a position as a third grade counselor at two Catholic schools solely because of her religious practice of covering her head. READS admits that it refused to hire Moore because of her religious practice of covering her head, but denies that such action violated Title VII. The EEOC seeks back pay and prejudgment interest, and demands that READS hire Moore as a counselor at one of its facilities.

The matter was tried before the Court sitting without a jury. For the reasons set forth in the following findings of fact and conclusions of law, the Court finds that READS unlawfully discriminated against Moore in violation of Title VII, and that Moore is entitled to be hired as a counselor for READS and to an award of back pay with interest.

### I. FINDINGS OF FACT

READS, Inc. is an employer within the meaning of 42 U.S.C. § 2000e(b). It is a private corporation which provides auxiliary services to nonpublic school students under a contract with the Philadelphia School District in compliance with Pennsylvania Act 89 of 1975.[1] Act 89 states "that the intermediate units in the Commonwealth shall furnish on an equal basis auxiliary services to all pupils in ... both public and nonprofit nonpublic schools." 24 P.S. § 9–972.1(a). In Philadelphia Coun-

---

1. In *Meek v. Pittenger,* 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975), the Supreme Court struck down as violative of the Establishment Clause of the First Amendment a prior Pennsylvania statute authorizing the intermediate units to provide auxiliary services to parochial school students inside the parochial school facilities. As a result of *Meek,* READS and other auxiliary service providers operating pursuant to Act 89 administer services in state-subsidized satellite buildings and trailers.

ty the intermediate unit is the Philadelphia School District. The services which it provides through READS include psychological testing and evaluation, counseling and guidance, and corrective education in reading and mathematics. Catholic day schools comprise seventy to seventy-five percent of those serviced pursuant to Act 89.[2] The remainder of the schools are affiliated with the Jewish, Muslim, Lutheran and Quaker faiths.

On January 2, 1986 Moore interviewed with READS for a position as a third grade counselor at two Catholic elementary schools. Moore wore a green pantsuit with a floral blouse and a green v-neck sweater. On her head she wore a two-toned green scarf tied to the side.

Joseph Lavoritano, the Coordinator of Counseling and Psychological Services for READS, interviewed Moore for the post. Lavoritano testified that he was "struck" by her head covering and suspected that she might be Muslim. Because he was uncertain, however, he asked Moore to explain her choice of dress. Moore told Lavoritano that she covers her head because she is Muslim.[3] Lavoritano then asked Moore what she would say if a student questioned her about her attire. Moore responded that she would tell the student that "it was a matter of personal choice and that [she] would then move to focus the counseling session on why the student was there in the first place." Moore admitted that she would tell the student that she was Muslim if she felt the situation appropriate, but that she would not do so if she anticipated that it would create "any problem" for the student. She added that her response would depend "on the context in which [she] was asked, [and] the student who asked the question."

Lavoritano did not recall asking Moore if she had ever been questioned by a student regarding her clothing. Moore, however, testified that in her experience as a counselor, she was questioned about her attire on only three occasions. On one occasion, a girl at an interfaith summer program told her, "you remind me of a Jewish woman." To this, Moore "just smiled and didn't add anything else or say anything to her." On a second occasion, Moore stated that a "young gentlemen" told her that she didn't have to dress as she did because he would protect her. Moore assumed that the remark was intended to reflect the boy's opinion concerning the dress requirements for Muslim women. Moore replied that she could take care of herself. On the final occasion, a child speculated that Moore covered her head, not for any religious purpose, but rather because she was bald. There is no evidence that Moore's attire in any way diminished her efficacy as a counselor, or that she ever sought to indoctrinate students in her religious beliefs when questioned about her attire or at other times.

After Lavoritano consulted with his supervisor, Stephen Freeman, the two men determined that allowing Moore to act as a counselor would cause READS to violate both a statutory and contractual duty to prohibit instructional employees from wearing "religious garb." Thus, Lavoritano informed Moore that she could be hired for the counselor position only if she removed her headcovering while on the job.[4] Moore rejected this suggestion, but expressed a willingness to vary her headcovering, and presented Lavoritano with several alternatives. These included a turban, a crochet cap, and differently tied scarves. In response, Lavoritano advised Moore that any form of headwear, if worn for religious purposes and on a daily basis, would be unacceptable to READS. Although Lavoritano testified that he might have hired Moore if she agreed not to tell students that she covered her head for religious reasons, he did not discuss with her how

---

2. At the time of trial, READS contract with the School District totalled $1,459,400 and was by far the largest source of revenues for READS.

3. READS does not challenge the sincerity of Moore's religious convictions.

4. READS never questioned Moore's academic qualifications. Rather, the testimony of both Moore and Lavoritano establishes that but for her headcovering Moore would have been hired by READS.

she might respond to potential inquiries in a manner inoffensive to READS.

Neither Lavoritano nor Freeman submitted Moore's application to School District officials, charged with final authority over hiring, to determine if Moore's attire would be considered "religious garb." Nor did they ask School District officials whether hiring Moore would jeopardize READS' contract, or whether some accommodation of Moore's practices was possible. Likewise, they did not submit Moore's application to legal counsel, or to any officials affiliated with the parochial schools.

The procedures followed by READS prior to hiring Moore differed from those James Ring, Director of Nonpublic School Services for the School District of Philadelphia, said he would have followed in determining the propriety of particular garb. Ring testified that if presented with a question regarding religious garb he would have (1) consulted with the School District's legal counsel and, (2) sought the advice of religious leaders within the schools to determine if the attire would be perceived as offensive to the educational environment. Neither was done in this case because Ring was not advised of the problem until after READS made the decision not to hire.

It is Moore's position that her attire is not "religious garb." She testified that although she covers her head in "an attempt to accommodate" the teachings of her religion, her dress does not comply with the requirements of the Koran,[5] and "would not strictly identify [her] ... as a Muslim." When asked at trial whether her clothing was an "aspect" of her "religious observance and practice" Moore responded "[n]ot as stated in the Koran and the Hadith."[6] Moore further testified that she did not believe a student from a Muslim home would be able to identify her as Muslim by reason of her clothing. She could not say whether a student from a Muslim home

would conclude that she was a non-Muslim, but she believed that it would depend upon the individual's understanding of the Koran and the Hadith.

In addition to Moore's testimony, the EEOC presented the testimony of the Iman of Moore's community, Shamsud Din Ali, who was shown photographs of Moore as attired on the day of her interview. He stated that based upon Moore's appearance he would not be able to tell that she is Muslim. The Iman further testified that while he understands that Moore attempts to attire herself in a "modest" fashion, her dress "doesn't fit" with the prescriptions of the Koran, and is "not the way that she should be dressed."

On January 16, 1986, after being denied a position as a counselor for READS, Moore filed a complaint against READS with the EEOC alleging discrimination in hiring based upon religion. The EEOC determined that Moore's allegations were well-founded and invited the parties to attempt conciliation. READS declined the invitation. In response, the EEOC filed the present action, seeking a position for Moore as a counselor with READS, back pay[7] and prejudgment interest.

## II. ISSUES PRESENTED

### A. *The Prima Facie Case—Conclusions of Law*

Title VII expressly prohibits employers from discriminating between employees or prospective employees on the basis of religion. Title VII provides that

(a) It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, be-

---

5. The Koran is the Holy Book of Islam.

6. The Hadith to which Moore referred is a compilation of sources on Islamic dress.

7. The parties agree that if back pay is due, the net amount owed, excluding interest, through March 31, 1991, is $31,698.21. The amount of

interest calculated by the EEOC using a fluctuating rate, pursuant to 26 U.S.C. § 6621, and compounding interest on a quarterly basis, is $6807.77. READS does not dispute the accuracy of the EEOC's calculations, although it argues that interest should be compounded annually.

cause of such individual's ... religion....

42 U.S.C. § 2000e–2(a)(1).

■ A plaintiff establishes a prima facie case of religious discrimination by showing that she (1) has a bona fide religious belief which conflicts with an employment requirement; (2) informed the employer of this belief; and (3) was adversely affected for failure to comply with the conflicting employment practice. *Protos v. Volkswagen of America, Inc.*, 797 F.2d 129, 133 (3d Cir.), *cert. denied*, 479 U.S. 972, 107 S.Ct. 474, 93 L.Ed.2d 418 (1986), (*citing Turpen v. Missouri–Kansas–Texas Railroad Co.*, 736 F.2d 1022, 1026 (5th Cir. 1984)).

Applying the foregoing test to the facts of this case the Court finds that Moore has established a prima facie case of religious discrimination. She has a bona fide religious belief which conflicts with READS' employment requirements, she so advised READS, and READS refused to hire her because, as part of her religious beliefs, she is required to cover her head.

### B. *The Undue Hardship Defense*

■ Once a prima facie case is established, the burden shifts to the defendant to produce evidence either (1) that it offered the employee or applicant a reasonable accommodation of her religious practices which she refused; or (2) that no accommodation was possible without subjecting it to "undue hardship." *United States v. Bd. of Educ. of School D. of Philadelphia*, 911 F.2d 882, 886 (3d Cir. 1990) ("*U.S.A.*"); *Protos*, 797 F.2d at 134. An undue hardship is incurred if the employer's accommodation requires it to assume more than a *"de minimis* cost." *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84, 97 S.Ct. 2264, 2277, 53 L.Ed.2d 113 (1977).

READS admits that it did not attempt to accommodate Moore. Rather, it contends that any accommodation of Moore's religious practices would place it in violation of a Pennsylvania statute and a State Department of Education "regulation" prohibiting instructional employees from wearing religious attire in the schools. READS also argues that hiring Moore would jeopardize its contract with the Philadelphia School District.

In support of its undue hardship argument, READS first cites 24 Pa.Stat.Ann. § 11–1112 and 22 Pa.Code § 17.1. Commonly known as the Garb Law, § 11–1112 is part of the Pennsylvania School Code of 1949. It states

(a) [t]hat no teacher[8] in any public school shall wear in said school or while engaged in the performance of his duty as such teacher any dress, mark, emblem or insignia indicating the fact that such teacher is a member or adherent of any religious order, sect or denomination.

(b) Any teacher employed in any of the public schools of this Commonwealth, who violates the provisions of this section, shall be suspended from employment in such school for the term of one year, and in case of a second offense by the same teacher he shall be permanently disqualified from teaching in said school. Any public school director who after notice of any such violation fails to comply with the provisions of this section shall be guilty of a misdemeanor, and upon conviction of the first offense, shall be sentenced to pay a fine not exceeding one hundred dollars ($100), and on conviction of a second offense, the offending school director shall be sentenced to pay a fine not exceeding one hundred dollars ($100) and shall be deprived of his office as a public school director. A person thus twice convicted shall not be eligible to appointment or election as a director of any public school in this Common-

---

**8.** "Teacher" is defined to include
 ... all professional employees and temporary professional employees, who devote fifty per centime (50%) of their time, or more, to teaching or other direct educational activities, such as ... *counselors* ... *certified in accord-*

*ance with the qualifications established by the State Board of Education.* 24 P.S. § 1141(1) (emphasis added).
Had Moore been hired by READS she would have become a certified counselor.

wealth within a period of five (5) years from the date of his second conviction.

READS contends that it is subject to the Garb Law by reason of 22 Pa.Code § 17.1. Section 17.1 requires the intermediate units to operate in accordance with the Public School Code of 1949 and to comply with the "regulations of the Board and the standards and guidelines of the Secretary." 22 Pa.Code § 17.1. READS reasons that it is a provider of auxiliary services for an intermediate unit and, as such, pursuant to § 17.1, it is subject to the Garb Law which is part of the Public School Code of 1949.

Secondly, READS claims that a "regulation" of the Department of Education makes the Garb Law applicable to providers of auxiliary services under Act 89. The document cited by READS states

> Religious garb shall not be worn by individuals providing auxiliary services to nonpublic school students under the provisions of Act 89. Auxiliary service personnel includes teachers, counselors, psychologists and other persons providing or assisting in the providing of auxiliary services.

Lastly, READS asserts that it is subject to the Garb Law and the "regulation" by virtue of its contract with the intermediate unit, here the School District of Philadelphia. This contract subjects READS to the provisions of Act 89, and to "the rules, regulations, standards and guidelines adopted by the Pennsylvania Department of Education...."

## III. CONCLUSIONS OF LAW

### A. *READS' Risk of Undue Hardship*

The basis of READS' undue hardship defense is that it is legally required to prevent its instructional employees from wearing "religious garb." To satisfy its burden of demonstrating "undue hardship" READS must do more than produce evidence that its employees are subject to a prohibition on the wearing of religious garb. READS must also demonstrate (1) that Moore's garb is so proscribed; and (2) that the proscription relieves READS of its duty to offer some accommodation of Moore's religious practices. *See EEOC v. Hacienda Hotel*, 881 F.2d 1504, 1513 (9th Cir.1989) (Contractual obligation of employer to allocate work on seniority basis was not, on its face, sufficient to relieve employer of its duty to accommodate employee's religious practice.) The Court holds that READS has failed to meet its burden.[9]

### 1. *READS' Obligation to Prohibit the Wearing of Religious Garb*

■ The first issue for resolution is whether READS is required by statute to prohibit its instructional employees from wearing religious garb. Although the Court agrees with READS that 22 Pa.Code § 17.1 subjects the intermediate units generally to the Pennsylvania School Code, it does not agree that § 17.1 also serves to apply to READS the particular section of the Public School Code known as the Garb Law.

Section (a) of the Garb Law prohibits "any teacher in any public school" from

---

**9.** The Court believes that placing the burden of "producing evidence" of undue hardship on READS is both consistent with the broad language of the Supreme Court in *Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 109 S.Ct. 2115, 2126, 104 L.Ed.2d 733 (1989), and with the Third Circuit's test in *Protos*, 797 F.2d at 134. · In doing so, however, it notes that the Supreme Court has never explicitly allocated the precise burdens in religious discrimination cases, *Ansonia v. Philbrook*, 479 U.S. 60, 107 S.Ct. 367, 93 L.Ed.2d 305 (1986). Moreover, cases from other circuits decided after *Wards Cove* suggest that an employer's burden of demonstrating that it can not accommodate an employee's religious practice without suffering "undue hardship" is more exacting than its burden of rebutting an employee's prima facie case in other Title VII contexts. *See, e.g., Toledo v. Nobel–Sysco, Inc.*, 892 F.2d 1481, 1490 (10th Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 2208, 109 L.Ed.2d 535 (1990) ("[A]n employer who has made no efforts to accommodate the religious beliefs of an employee or applicant before taking action against him may only prevail if it shows that no accommodation could have been made without undue hardship."); *EEOC v. Hacienda Hotel*, 881 F.2d 1504, 1512 (9th Cir.1989) ("Once the employee has established a prima facie case, the burden shifts to the employer to prove that it made good faith efforts to accommodate the employee's religious beliefs.")

wearing religious garb. Section (b) of the Garb Law renders criminally liable any "public school director" who knowingly employs a teacher dressing in violation of subsection (a). READS employees who administer auxiliary services to nonpublic parochial school students are neither "teachers in any public school" under subsection (a), nor teachers "employed in any of the public schools" under subsection (b).[10] Moreover, READS itself is a private organization, and thus not a "public school director" subject to criminal liability under subsection (b).

■ READS' second argument is that even if not directly subject to the Garb Law, it must nevertheless comply with the "regulation" of the Department of Education prohibiting the wearing of religious garb. READS states that this "regulation" incorporates and makes applicable the Garb Law to providers of auxiliary services. READS also states that the "regulation" is binding on READS through 22 Pa.Code § 17.1 and 24 Pa.Stat.Ann. § 9–972.1, and through READS' contract with the intermediate unit.

The document to which READS refers is not a "regulation" in any official sense, but rather is a response to a question, issued by the Department of Education upon advise of counsel, following the passage of Act 89. Thus, it is more aptly termed a standard. Moreover, although it prohibits teachers and counselors operating under Act 89 from wearing religious garb, it does not refer to or incorporate the precise language of the Garb Law. It differs from the Garb Law in that it does not expressly define "religious garb," and does not impose sanctions on employers or employees for violation of its terms. Thus, the Court concludes the standard does not make the Garb Law applicable to READS.

■ Alternatively, READS argues that the Department of Education "regulation" —which the Court will refer to as a "standard"—is binding on READS both through 22 Pa.Code § 17.1 and 24 Pa.Stat.Ann. § 9–972.1, and through its contract with the intermediate unit, and the Court so finds. Both 22 Pa.Code § 17.1 and 24 Pa. Stat.Ann. § 9–972.1 require the intermediate unit, and thus READS, to comply with the "standards of the Secretary" of Education. In addition, READS' contract with the intermediate unit requires compliance with "the rules, regulations, *standards* and guidelines adopted by the Pennsylvania Department of Education...."

### 2. *The Nature of Moore's Attire*

Having shown that it is subject to a standard regulating the wearing of religious garb, READS must produce evidence that Moore's headcoverings are so proscribed.

In *United States v. Board of Educ. of School D. of Philadelphia*, 911 F.2d 882 (3d Cir.1990), (*"U.S.A."*), the Third Circuit held that the Pennsylvania Board of Education was not guilty of discrimination under Title VII when it discharged Delores Reardon, a devout Muslim, from her position as a substitute teacher in the Philadelphia School District because she refused to wear non-religious attire. The majority opinion concluded that Reardon's practices were not "religion" protected by Title VII because they could not be accommodated without undue hardship. The undue hardship found by the Third Circuit was the risk of exposure to the Garb Law's criminal sanctions. *U.S.A.*, 911 F.2d at 891.

In *U.S.A.*, the Third Circuit did not specifically address what forms of attire come within the ambit of the Garb Law, or for present purposes, the Department of Education standard. In the Court's view, the School Board "reasonably concluded" that the teacher's attire was prohibited garb. That attire consisted of a "head scarf which covered her head, neck, and bosom leaving her face visible and a long loose

---

10. In finding READS employees are not "teachers in any public school" for purposes of the Garb Law, the Court does not suggest that READS may ignore the Supreme Court's admonition in *Meek* that providers of auxiliary services to parochial schools must remain separate from and neutral to the religious institutions they serve. *Meek,* 421 U.S. at 372, 95 S.Ct. at 1766.

dress which covered her arms to her wrists." *U.S.A.*, 911 F.2d at 884. The Court noted, however, that the complaint in the case did not contest the religious nature of Reardon's clothing, or deny that some students might understand her attire as communicating religious affiliation.

■ The facts of *U.S.A.* leave unanswered the question whether the Department of Education standard presently at issue encompasses less obtrusive or neutral attire worn for religious purposes. *U.S.A.* dealt with the language of the Garb Law, proscribing the wearing of "any dress, mark, emblem or insignia *indicating* the fact that such teacher is a member or adherent of any religious order, sect or denomination." 24 Pa.Stat.Ann. § 11–1112 (emphasis added). The Department of Education standard prohibits the wearing of "religious garb." Although it does not define that term, the Court concludes that the meaning of "religious garb" contained in the standard is co-extensive with the meaning of "religious garb" contained in the Garb Law.

■ In determining the scope of the standard, the Court recognizes that "religious garb" may include many different forms of attire. First, there is attire which is facially religious and worn for religious reasons. As an example, certain clerical garb falls into this category, and constitutes "religious garb." Secondly, there is attire worn for religious reasons which is perceived as religious. In the *U.S.A.* case, the Third Circuit stated in dicta that attire which may not clearly identify a teacher as an adherent of a particular religion is nevertheless "religious garb" if it is apt to be perceived as religious by "many" school children. *U.S.A.*, 911 F.2d at 890 n. 6. Finally, there is attire which is worn for religious reasons, but which is not recognized as such until its significance is explained by the wearer. Examples of such garb could include the dark suit worn by an Amish man, or the wig worn by a married

woman who is an Orthodox Jew. The Court holds that attire falling into this final category is not "religious garb" because it does not indicate the wearer's religious affiliation.

■ READS primary argument is that Moore's headcoverings are "religious garb" because they are either facially religious or likely to be perceived as religious by students in the classroom setting. The Court rejects that argument. First, there is no evidence that Moore's attire is facially religious. Secondly, the Court finds that the evidence of others' perception of Moore's headcovering falls far short of demonstrating that Moore's garb is viewed as religious. READS did not offer any expert testimony that Moore's attire identifies her as either a Muslim or as a member of any other religious group, nor did it rebut the testimony of Moore or her Iman that the colored scarf worn by Moore on the day of her interview would not necessarily indicate her Muslim faith.[11] Most importantly, READS did not produce any probative evidence that children, such as the third graders Moore applied to counsel, would perceive Moore's garb to be religious. *Cf. U.S.A.*, 911 F.2d at 890 n. 6.

■ READS' second argument is that whether or not Moore's attire, standing alone, indicates her religion, Moore's admission that she covers her head for religious reasons is sufficient to invoke the strictures of the Department of Education standard. READS fears that a person who dresses in a particular fashion for religious reasons might at some time reveal her purposes to her students and that such a revelation might provoke conversation regarding the wearer's religious practices and beliefs.

■ The Court holds that this argument is too attenuated. The Department of Education standard proscribes religious garb—not verbal statements of religious

---

11. The Court credits the statements of Moore and her Iman that Moore's attire does not comply with the requirements of Islam. In doing so, however, the Court does not hold that only attire which conforms strictly to the tenets of a religion is proscribed by the Department of Education standard. Nor does it wish to suggest that a Federal Court may rule on matters of compliance with the requirements of a particular religion.

affiliation. If the standard is not triggered by the attire itself, it does not come into play as a result of subsequent remarks concerning the attire.[12] READS does not cite any legal authority barring teachers from referring generally to the existence of religion, or to their own religious beliefs.[13] Nor does READS claim that its faculty members are prohibited from talking about religious practices unrelated to dress.[14]

■■■ Thirdly, READS argues that Moore's headcovering should fall under the standard proscribing religious attire because of the risk that it will offend the religious sensibilities of persons affiliated with the parochial schools serviced by READS. This Court rejects the suggestion that, absent the type of religious garb proscribed by the standard at issue, someone in Moore's position should not be hired because her employment might offend parochial institutions receiving public assistance. The proscription on religious garb is intended to prevent any appearance of State sponsored religion; it is not a vehicle for protecting the religious practices of particular institutions over the competing practices of individual employees such as Moore.

■■■ READS' fourth argument is that it was compelled not to hire Moore because of the risk that, once employed, she might decide to wear more overtly religious attire. The Court deems this argument to be based on mere speculation, and without foundation in light of Moore's testimony that she does not wish to follow more strictly the dress requirements of Islamic law. This risk also is illusory because READS maintains at all times the authority to discipline or dismiss employees if and when they dress in violation of the garb

standard. In addition, READS' policy guidelines specifically state that READS "reserves all rights to determine continuation of employment including the right to discharge."

■■■ READS' final argument is that if Moore's garb is not religious for purposes of the Department of Education standard, READS' failure to hire Moore cannot be discrimination based on religion in violation of Title VII. The Court rejects this position.

The standard at issue is an attempt to prevent persons administering auxiliary services from appearing to endorse certain religious beliefs. The concern is that students might see a teacher wearing religious clothing, and understand this expression of faith as a statement concerning what beliefs they too should hold. If, however, the clothing is worn for religious reasons but is unlikely to convey a message concerning religious affiliation or belief to students, the risk is not present and the prohibition is unnecessary.

By contrast, Title VII focuses on preventing discrimination by employers against employees who express themselves to be adherents of a particular religious denomination. Religion, as defined by Title VII, includes

> ... *all aspects of religious observance and practice, as well as belief,* unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.

42 U.S.C. § 2000e(j) (emphasis added). Title VII is triggered when a person is deprived of an employment opportunity because of a bona fide religious belief. It is

---

12. The Court does not reach the case of a teacher paid with public funds who, when asked about her garb, seeks to indoctrinate students in her religious beliefs. Such facts would require the Court to consider whether the teacher's conduct, taken as a whole, violates the Establishment Clause of the First Amendment.

13. Consistent with the requirements of Title VII, READS also grants employees the right to personal leave for days of religious observance,

without requiring that they refrain from telling students of the religious purpose of their absence. *See Ansonia,* 479 U.S. 60, 107 S.Ct. 367.

14. Some of READS' faculty members are Nuns. Although required to wear non-clerical attire, there is no evidence that they are prohibited from informing students of their religious affiliations.

not necessary that the person's belief or practice be widely held or recognized by others as religious. There is no inconsistency in holding that Moore's headcoverings, worn in an attempt to accommodate the requirements of her religion and thus protected by Title VII, are not dress which triggers application of the Department of Education standard.

Thus, the Court concludes that Moore's headcoverings are not "religious garb" proscribed by the Department of Education standard because although worn for religious purposes they are not perceived as such. This finding is made in light of the Court's conclusion that the prohibition on religious garb was adopted to prevent teachers from dressing in a manner which might be understood by their students as an endorsement of religion—i.e. the garb must "indicate" the wearer's religious affiliation. *Cf.* 24 Pa.Stat.Ann. § 11–1112. Attire which is either facially neutral or sufficiently ambiguous that it will not be perceived as religious does not pose this threat. Thus, it should not trigger the garb standard.[15]

### 3. *READS' Duty to Accommodate Moore*

 Lastly, the Court must address READS' argument that a post-facto finding that Moore's headcoverings are not "religious garb" does not neutralize the risk of undue hardship faced by READS at the time it decided not to hire Moore. READS' position is that had it hired Moore, believing her garb permissible, and had the School District subsequently disagreed with this evaluation, READS would have faced termination of its contract.[16] As such, READS claims it could not have offered Moore any accommodation of her religious practices.

In *Trans World Airlines, Inc. v. Hardison,* 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977), the Supreme Court explained the extent of an employer's obligation under Title VII to accommodate the religious practices of an employee. In *Hardison,* the Court held that Title VII does not require an employer to abrogate a collective bargaining agreement which is non-discriminatory and intended to accommodate the needs of all employees. Requiring the employer to bear "more than a *de minimis* cost," the Court said, would constitute an undue hardship. *Hardison,* 432 U.S. at 84, 97 S.Ct. at 2277.

In addition to articulating the *"de minimis* cost" test, *Hardison* made clear that whether an employer can reasonably accommodate an employee's religious practices is a question of fact. In reaching its decision, the Court cited the findings of the District Court that TWA did not merely deny Hardison the leave he requested. Rather,

> [i]t held several meetings with plaintiff at which it attempted to find a solution to plaintiff's problems. It did accommodate plaintiff's observance of his special religious holidays. It authorized the union steward to search for someone who would swap shifts, which apparently was normal procedure.

432 U.S. at 77, 97 S.Ct. at 2273 *(citing* 375 F.Supp. 877 at 890–91 (W.D.Mo.1974)). TWA also sought to find Hardison another job.

READS, on the other hand, has produced no evidence that it could not have reasonably accommodated Moore's religious practices without risking violation, and subsequent termination, of its contract. The decision not to hire Moore followed only an informal conversation between Lavoritano

---

**15.** Although the parties have not placed the First Amendment directly at issue, the Court believes that no prohibition on religious garb can be read in a vacuum. The Department of Education standard is clearly intended to further the goals of the Establishment Clause. Yet, in doing so, it need not prohibit those practices which do not impermissibly endorse religion. *Edwards v. Aguillard,* 482 U.S. 578, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987). The Court's hold-

ing that the garb standard encompasses only attire worn for religious purposes and *perceived* as religious by school children is consistent with the goals of the Establishment Clause.

**16.** The Court concludes that READS could demonstrate "undue hardship" by showing that hiring Moore would subject it to a loss of its contract.

and Freeman, and was made without the advice of counsel concerning the scope of either the standard, or the Garb Law, which READS believed applicable. Although James Ring, Director of Nonpublic School Services for the School District of Philadelphia, testified that if presented with a question regarding religious garb he would have sought the opinion of a theologian, READS did not consult any Muslim authorities concerning Moore's attire, nor did it question representatives from the Catholic school serviced by READS. Most importantly, READS denied Moore a job without first submitting her application to the School District, the body vested with final authority to approve or disapprove READS' hiring decisions. Had it done so, READS would have learned whether the School District considered Moore's attire improper, and whether hiring Moore would have threatened READS' operation.

READS also did not fully investigate potential compromises which might have allowed Moore to obtain the counselor position. Lavoritano stated during his testimony that he might have been willing to hire Moore if she had promised not to tell children that she covered her head for religious reasons. He did not, however, express this willingness to Moore, or discuss with her how she might respond to questions in a manner inoffensive to READS' contract. Moreover, READS did not produce evidence that Moore's proposed accommodation, selecting a variety of headcoverings with a fashionable appearance, would not have allowed READS to hire Moore without risking "undue hardship." To the contrary, READS rejected Moore's accommodation without knowing whether the varied headcoverings would be perceived as religious.[17]

17. Consistent with the holding of *Ansonia Bd. of Educ. v. Philbrook,* 479 U.S. 60, 107 S.Ct. 367, 93 L.Ed.2d 305 (1986), the Court does not suggest that READS was required to accept Moore's preferred means of accommodation. Rather, it finds that READS' blanket refusal to consider any accommodation is not supported by evidence of a risk of undue hardship.

18. In reaching its conclusion, READS did not consider the impact of a competing clause of its contract with the School Board. It states:

READS cannot rely on its unilateral determination as the basis for its failure to accommodate Moore. *See Smith v. Pyro Min. Co.,* 827 F.2d 1081, 1086 (6th Cir.1987) (An employer "cannot rely merely on speculation" to demonstrate "undue hardship."). The record establishes that READS could have but did not make reasonable efforts to investigate the problem and its possible solutions.[18] Absent such efforts, and in light of the above finding that Moore's garb is not proscribed by the garb standard, the Court concludes that READS has not produced evidence of undue hardship, or of a reasonable risk of undue hardship, so as to relieve it of its duty to accommodate Moore.

### B. *Remedies*

Moore claims that consistent with the language and goals of Title VII, she is entitled to an award of back pay, with interest, as well as to a position as a counselor at a READS facility. READS does not dispute that a Title VII plaintiff not hired for religious reasons may claim a right to the job which she was initially denied. As such, the Court will order READS to hire Moore as a counselor as soon as a position becomes available.

The only issue remaining before the Court is Moore's right to back pay. Title VII provides that

If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may

The parties hereto agree that there shall be no discrimination against any employee or any person on account of ... religious creed ... in the performance of this contract, and that *should evidence of such discrimination be produced or become available, S.D.P. [School District of Philadelphia] shall have the right to terminate this contract.*

include, but is not limited to, reinstatement or hiring of employees, with or without back pay ... or any other equitable relief as the court deems appropriate.

42 U.S.C. § 2000e–5(g).

In *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), the Supreme Court held that after a finding of unlawful discrimination a court must use its equitable powers to fashion the most complete relief available. In doing so, it must consider the two goals of Title VII: (1) to undo the effects of prior discrimination, and (2) to make whole the victim of the discriminatory practice. Back pay should be denied "only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole...." *Albemarle*, 422 U.S. at 421, 95 S.Ct. at 2373.

Most significantly for purposes of the present litigation, the *Albemarle* court expressly held that an employer's lack of bad faith is not an automatic basis for denying back pay. The mere absence of bad faith "simply opens the door to equity; it does not depress the scales in the employer's favor." As the Court explained, "Title VII is not concerned with the employer's 'good intent or absence of discriminatory intent' for 'Congress directed the thrust of the Act to the *consequences* of employment practice, not simply to the motivation'." *Albemarle*, 422 U.S. at 422, 95 S.Ct. at 2374 (*citing, Griggs v. Duke Power Co.*, 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971)).

*Albemarle* was a wrongful discharge case. In *Gurmankin v. Costanzo*, 626 F.2d 1115 (3d Cir.1980), *cert. denied*, 450 U.S. 923, 101 S.Ct. 1375, 67 L.Ed.2d 352 (1981), the Third Circuit awarded back pay in a case involving an unlawful failure to hire.[19] In doing so, it rejected the district court's argument that back pay was not appropriate because the employer lacked notice that its acts were violative of Title VII. In *Gurmankin*, like the instant case, the employee was a teacher deprived of rights under Title VII because of the employer's reliance on an existing policy of the State Department of Education.

The Court finds that READS exhibited no bad faith in this case, and did not willfully discriminate against Moore. Nevertheless, to deny back pay would frustrate the statutory purpose of Title VII—the eradication of employment discrimination and the compensation of victims of employment discrimination is such a way as to make them whole. Accordingly, the Court will award Moore back pay with interest.

## IV. CONCLUSION

For the above-stated reasons, the Court holds that Moore has met her ultimate burden of proof that she was discriminated against because of her religion in violation of Title VII, 42 U.S.C. § 2000e–2(a)(1). In so holding, the Court finds that READS has not met its burden of producing evidence of undue hardship so as to relieve it of its duty to accommodate Moore. Accordingly, the Court will order that Moore (a) be hired by READS as a counselor as soon as a position becomes available, and (b) be awarded back pay with interest.[20] An appropriate order will follow.

### ORDER

AND NOW, to wit, this 25th day of March, 1991, in accordance with the foregoing Findings of Fact and Conclusions of Law, IT IS ORDERED that judgment is entered in favor of plaintiff, Equal Employment Opportunity Commission, and against defendant, READS, Inc., and, in accordance therewith,

---

**19.** Although *Gurmankin* involved § 1983 rather than Title VII, the Third Circuit held that there is no distinction in the equitable remedies afforded by the two provisions. 626 F.2d at 1120.

**20.** Interest will be calculated using a fluctuating rate, pursuant to 26 U.S.C. § 6621, the statute setting the interest charged or paid by the IRS.

This interest shall be compounded quarterly. *Green v. United Steel Corp.*, 640 F.Supp. 1521, 1548 (E.D.Pa.1986), *vacated in part on other grounds*, 843 F.2d 1511 (3d Cir.1988), *cert. denied*, — U.S. —, 111 S.Ct. 53, 112 L.Ed.2d 29 (1990).

IT IS FURTHER ORDERED that defendant, READS, Inc., shall pay Cynthia Moore back pay including interest in the amount of $38,505.98 [1] and shall hire Moore as a counselor for READS as soon as a position becomes available.

---

1. The parties *stipulate* that the net amount of earnings accrued through March 31, 1991 is $31,698.21. Using a fluctuating interest rate, pursuant to 26 U.S.C. § 6621, and compounding interest quarterly, the EEOC calculates the total amount of interest to be $6,807.77. Insofar as READS does not challenge the EEOC's computations, the Court will apply the interest calculations submitted by the EEOC, for a total back pay award of $38,505.98.