Isaiah BROWN, Plaintiff,

v.

POLK COUNTY, IOWA, a Municipal Corporation; Ray Sears, Former Polk County Administrator for Polk County; and The Polk County Board of Supervisors, Defendants.

Civ. No. 4–91–10674.

United States District Court,
S.D. Iowa, C.D.

Aug. 11, 1993.

See also 811 F.Supp. 432.

Robert A. Wright, Jr., Des Moines, IA, for plaintiff.

Mark Godwin, Asst. Polk County Atty., Des Moines, IA, for defendants.

## ORDER

LONGSTAFF, District Judge.

Plaintiff, Isaiah Brown, brought this action against his former employer, Polk County and Ray Sears, alleging violations of Title

VII and 42 U.S.C. § 1983. A bench trial commenced on Monday, May 10, 1993. Plaintiff was represented by Robert A. Wright, Jr. and Defendants were represented by Assistant Polk County Attorney, Mark Godwin.

## I.  INTRODUCTION

This suit arises out of Plaintiff's termination as Director of the Information Services Department of Polk County. Plaintiff, Isaiah ("Ike") Brown maintains his discharge was the result of racial and religious discrimination. Plaintiff also asserts that Defendants violated his First Amendment rights of freedom of expression and freedom of religion.

On February 11, 1991, Plaintiff filed a complaint with the Iowa Civil Rights Commission and the Equal Employment Opportunity Commission alleging discrimination by his employer, Polk County. Plaintiff received a right-to-sue letter and brought this action alleging violations of 42 U.S.C. § 1983, Title VII of the Civil Rights Act of 1964 and the Iowa Civil Rights Act.

## II.  FACTUAL FINDINGS

Plaintiff, Isaiah Brown, is a 39 year-old African-American male and self-professed born-again Christian. Plaintiff was hired by the Defendant, Polk County, in 1983 as Manager of Computer Operations for Polk County. He served in that capacity until 1986 when he was promoted to the position of Director of the Polk County Information Services Department ("ISD").[1] Plaintiff served as the Director of Information Services until he was terminated on December 3, 1990. In his capacity as Director of the ISD, Plaintiff was responsible for planning and organizing Polk County's data processing operations. Plaintiff gave technical data processing advice to department heads and elected officials. Plaintiff also supervised approximately 50 employees in the data processing department. As a technical specialist in data pro-

cessing, Plaintiff made periodic suggestions for improvement in the County's data processing programs. If deemed appropriate by County Administrator Ray Sears or the appropriate review committee, Plaintiff's recommendations were presented to the Board of Supervisors for consideration.

As ISD Director, Plaintiff experienced difficulty with project scheduling. Many ISD projects were behind schedule, requiring the frequent revision of proposed project timetables. In 1988, an oversight board called the Systems Development Review Committee (SDRC) was created to monitor the ISD. The SDRC was composed of Supervisor Clark Rasmussen, Comptroller Jim Koolhof, and Sears. Plaintiff was an ex-officio member of the Committee. The plans, projects and budget for Plaintiff's department were reviewed by the SDRC before submission to the Polk County Board of Supervisors.

As a department head, Plaintiff was evaluated on an annual basis by his immediate supervisor, Ray Sears. For the most part, Plaintiff's evaluations were satisfactory. Sears, however, expressed concern with Plaintiff's ability to communicate, delegate authority and maintain pre-determined schedules in Plaintiff's 1988, 1989 and 1990 performance evaluations. Sears also cited problems with morale in the ISD.

In late 1989 the ISD continued to experience delays in meeting project deadlines. In an attempt to address the problem, the Board of Supervisors entered into a contract with an outside consulting firm to evaluate the ISD. The study concluded with a written report recommending various changes in the ISD, including a complete shift in the mission of the ISD from a "development" department to a "maintenance" department, the furlough of twenty-five (25) employees, the elimination of 11 positions, and the reclassification of several other positions. The restructuring process was to be completed by May 1, 1990.

---

1. Plaintiff was appointed to the position of Director of the ISD by Ray Sears, Polk County Administrator. Sears, as Polk County Administrator, was not an elected official, but served as a liaison to the Polk County Board of Supervisors.

Sears served as a staff advisor to the Board of Supervisors on matters relating to County operations. His duties included developing, recommending and monitoring the effective implementation of Board policies.

Upon learning of the planned reorganization, ISD employees began to speculate as to which employees would be placed in jeopardy by the reorganization. Rumors were further fueled by low morale and a polarization within the ISD. The source of that polarization, at least in part, was a division in the department between a cohesive group of born-again Christian employees and the other ISD employees. Plaintiff, as a born-again Christian, was close to those ISD employees who shared his faith. The group's affiliation began in 1985, with the formation of an early morning Bible study held before working hours in the Polk County Administration Building.[2] After the organized Bible study ceased, the group remained close and sometimes gathered to pray or discuss their personal problems. On at least one occasion, the group engaged in spontaneous prayer in Brown's office. As may have been expected, the closeness of the born-again Christian faction caused resentment among the other ISD employees. Consequently, when news of a reorganization reached employees in the ISD, there was concern. that Brown would give rehiring preference to members of the born-again Christian group.

Concerned with rumors about reorganization, Brown issued a memorandum stating religious affiliation would play no role in reorganization decisions. Brown then called a department-wide meeting to emphasize that preference would not be given born-again Christians. On May 2, 1990 Brown met with the rehired employees to further facilitate departmental communication. At that meeting, Brown professed his Christianity but pointed out to the rehired employees that their religious beliefs did not enter into the decision making process. Brown also discussed with employees the importance of a work ethic. In so doing, he referenced a passage in the Bible which spoke against slothfulness.[3]

In the spring and early summer of 1990, complaints of inappropriate religious activities in the ISD were made to the Personnel Department and to the office of the County Administrator. Based upon these complaints, Ray Sears requested an investigation into religious activity in the ISD. Thomas Evans, Labor Relations Manager for Polk County, filed a report on July 16, 1990.[4] In addition to prayer meetings and religious counseling, the report indicated that Brown also had Bible study notes typed by his secretary and that Brown solicited funds from employees for a church project.[5] As a result of the report, Plaintiff was issued a written reprimand on July 20, 1990. The reprimand ordered Brown to end his role in all religious activities on County time and to see that employees in the department did the same. The reprimand also ordered Brown to cease all religious proselytizing, witnessing or counseling at work.[6] Plaintiff did not receive the full raise that he expected in 1990 because of the reprimand.

Shortly after Plaintiff's reprimand, Ray Sears attended a departmental meeting in Brown's office. At that meeting, Sears noticed certain religious items on Plaintiff's

2. The Bible study group was later told they could not use Polk County property for meetings unrelated to work. The group then moved the Bible study meetings to a room in the city library. Shortly thereafter, the group ceased meeting on a regular basis.

3. Plaintiff's statements were made in the following contexts: First, Plaintiff noted that he was a born-again Christian, but that neither his religion nor the religion of ISD employees would play any role in his supervision of the ISD. Second, Plaintiff, in encouraging employees to maintain a strong work ethic, stated that one of the most useful things he has gleaned from studying the Bible is the directive to work hard and not be slothful.

4. Evans was assigned the investigative task by Diana Williams, Personnel Director for Polk County.

5. Plaintiff's use of his secretary to type religious materials, however, had ceased prior to the investigation. Also, the report's allegation that Brown had solicited funds for church in the workplace, was not supported by the evidence at trial.

6. The reprimand read in part:
Mr. Brown will immediately cease any activities that could be considered to be religious proselytizing, witnessing, or counseling and will further cease to utilize County resources that in any way could be perceived as to be supporting a religious activity or religious organization.

desk and office walls. Sears instructed Plaintiff to remove all religious paraphernalia from his office. The items that Brown was instructed to remove included a wall plaque, a framed wall poster, a ceramic item with the Lord's prayer and a small folding stained glass plaque. Brown was also instructed to remove a small Bible which he kept in his desk. Brown complied with Mr. Sears' orders to remove these items.

In August of 1990 a series of newspaper articles appeared in the *Des Moines Register* detailing the incidents of religious activity within the ISD. The reports also indicated that several employees had filed charges with the EEOC alleging religious discrimination during the reorganization process. In any case, Plaintiff continued as supervisor of the ISD, and no new instances of religious activity were reported.

On November 20, 1990, Ray Sears issued Ike Brown another written reprimand. The reprimand addressed two actions taken by Brown which reflected poorly on his judgment with regard to budgetary matters. First, Sears expressed concern over Brown's utilization of bargaining unit employees on an on-call basis. Although not contrary to their union contract, Sears was disturbed with the lack of budgetary funds for such a use of employees. Second, Sears also voiced concern with Brown's recommendations relating to changes in the data processing system in the County Treasurer's Office.[7] Specifically, Sears noted that there were more efficient and affordable alternatives to Brown's proposal.

In November of 1990, Ray Sears ordered Tom Evans to conduct another investigation of the ISD. This time, however, the investigation was prompted by reports that county computers were being used for personal business. Inappropriate use of County computers was a reoccurring problem in the ISD. Plaintiff previously sought to address the issue through a department-wide memoran-

dum. Despite the memorandum, however, personal use of computers by ISD employees continued. Among the items found on ISD computers during the investigation were pornography, games, personal budgets and religious material.[8]

Evans completed his investigation into the personal use of computers on Friday, November 30, 1990. When Evans left work on November 30, he had not yet completed a written report for Sears. Over the weekend, an excess of 10 inches of snow fell on the Des Moines area. On Monday morning, Tom Evans was snowbound and unable to get to work. Upon learning that Evans' investigation was complete, however, Ray Sears made arrangements for a Polk County employee to pick up Evans with a four wheel drive vehicle. Evans made it into the office and met with Sears in the early afternoon of December 3, 1990. On December 3, 1990, Plaintiff was terminated by Mr. Sears with Mr. Evans in attendance. Plaintiff was given the opportunity to resign but refused.

After Plaintiff's termination, Ray Sears assumed the role of interim director of the ISD. In March of 1991, the ISD underwent yet another major reorganization. The department ceased to exist as an independent department in Polk County, and was reorganized under the auspices of the General Services Department.

## III. DISCUSSION OF LAW AND FACTS

### A. TITLE VII and the Iowa Civil Rights Act

Section 703(a)(1) of the Civil Rights Act, 42 U.S.C. § 2000e–2(a)(1) provides in part:

(a) It shall be an unlawful employment practice for an employer—(1) ... to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, condi-

---

7. A modification in the County Treasurer's data processing system was necessitated by legislation altering real estate tax assessments and collections.

8. The personal use of computers was of particular concern to the County because of (1) the

reoccurring nature of the problem; (2) the potential for sexual harassment claims as a result of the pornographic material on the computers; and (3) the effect such widespread personal use of computers may have on productivity.

tions, or privileges of employment because of such individual's race ... religion.... Likewise, Iowa Code § 216 also makes it a violation of state law to discharge an employee because of his religion or race. Iowa Code § 216.6 (1993).[9] Plaintiff contends Defendants violated both Title VII and the Iowa Civil Rights Act by discharging him because of his race and/or religion. For purposes of this opinion, the Court will assess concurrently Plaintiff's Title VII and state civil rights claims, as both claims require the same elements of proof. *See e.g. Hall v. Gus Construction,* 842 F.2d 1010 (8th Cir.1988); *see also Sommers v. Iowa Civil Rights Comm'n,* 337 N.W.2d 470, 477 (Iowa 1983).

### 1. Race Discrimination

■ There are two manners of proceeding in a Title VII race discrimination case. If a plaintiff demonstrates that an illegitimate criteria was a motivating factor in the employment decision, a "mixed motives" theory is appropriate. *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989); *Radabaugh v. Zip Feed Mills, Inc.,* 997 F.2d 444, 448 (8th Cir.1993); *Stacks v. Southwestern Bell Yellow Pages, Inc.,* 996 F.2d 200, 201 (8th Cir.1993). Under the "mixed motives" theory, once a plaintiff establishes that race is a motivating factor, the defendant can escape liability only by proving that it would have made the same decision in the absence of discrimination. *Id.*

■ If, however, a Plaintiff cannot produce direct evidence of discrimination the three-stop analysis of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) is appropriate. Under *McDonnell Douglas,* (1) the plaintiff must present a prima facie case; (2) the defendant must rebut the prima facie case by showing non-discriminatory reasons for termination; and (3) the plaintiff must show the reasons are pretextual and that intentional discrimination was the proven reason for the discharge. *Id.* at 802–04, 93 S.Ct. at 1824–25; *St. Mary's Honor Center v. Hicks,* —— U.S. ——, ——, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993);[10] *see also Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981).

In the present case, there is no direct evidence of race discrimination. There is no evidence of actions or remarks of "the employer that reflect a discriminatory attitude." *Gray v. University of Ark.,* 883 F.2d 1394, 1398 (8th Cir.1989). No evidence was presented to suggest a "discriminatory animus in the decisional process". *Price Waterhouse v. Hopkins,* 490 U.S. at 258, 109 S.Ct. at 1794; *Cf. E.E.O.C. v. Alton Packaging Corp.,* 901 F.2d 920, 923–25 (11th Cir.1990) (statement made by person responsible for promotion decisions that "if it was his company, he wouldn't hire any black people" constituted direct evidence). Therefore, because there is no direct evidence of race discrimination, the three-part analysis of *McDonnell Douglas* is applicable.

■ Plaintiff has established a prima facie case. Defendant, therefore, must come for-

9. Iowa Code Section 216.6 reads:

   1. It shall be an unfair or discriminatory practice for any:
   a. person to refuse to hire, accept, register, classify, or refer for employment, to discharge any employee, or to otherwise discriminate in employment against any applicant for employment or any employee because of the age, race, creed, color, sex, national origin, religion or disability of such applicant or employee, unless based upon the nature of the occupation ...

10. As recognized by the Court in *St. Mary's Honor Center v. Hicks,* —— U.S. ——, ——, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993), it is not enough that the fact finder concludes a defendant's reasons for discharge are pretextual. Instead, in order to prevail a plaintiff must also demonstrate that the employee's termination was the result of the employer's intentional discrimination. As the Court noted:

> We have no authority to impose liability upon an employer for alleged discriminatory employment practices unless an appropriate fact finder determines, according to proper procedures, that the employer has unlawfully discriminated. We may, according to traditional practice, establish certain modes and orders of proof, including an initial rebuttable presumption of the sort we described earlier in this opinion, which we believe McDonnell Douglas represents. But nothing in law would permit us to substitute for the required finding that the employer's action was the product of unlawful discrimination, the much different (and much lesser) finding that the employer's explanation of its action was not believable.

*Id.* —— U.S. at ——, 113 S.Ct. at 2571.

ward with evidence of a nondiscriminatory reason for the adverse employment action. *See Valdez v. Mercy Hosp.*, 961 F.2d 1401, 1403 (8th Cir.1992). Defendant presented evidence that Plaintiff was terminated because of his work-related performance. Although technically qualified, Brown did not adequately execute his supervisory and administrative functions.

Brown's deficiency in meeting deadlines, managing employees and communicating the technical aspects of data processing was documented by employment evaluations for 1988, 1989, and 1990.[11] Brown also failed to properly consider County budgetary concerns, as was required by his administrative post. Brown was issued a written reprimand for exceeding the County's budget when using employees on an on-call basis. Plaintiff was also criticized for spending an unnecessary amount of County funds to revise the County Treasurer's data processing system.

Ike Brown's difficulties in the department were evidenced by the need for a review committee to oversee the ISD's operations. No other County department required such a committee. Problems with the ISD were extensive enough to also require the hiring of an outside consulting firm by the County to diagnose and recommend solutions to the problems in the ISD.

Plaintiff's most significant downfall, however, was as a supervisor. During Plaintiff's reign as Director of the ISD, the ISD experienced morale problems. Those morale problems were due, at least in part, to the polarization of employees within the ISD. Plaintiff contributed to the polarization by engaging in inappropriate religious activities on county time. Plaintiff was unable to control and supervise employees in the department as evidenced by personal use of computers and the inability to meet project deadlines.[12] It was the combination of these various inadequacies which led the County to conclude that Defendant had "lost control of his department" resulting in his discharge.

The next step in assessing Plaintiff's claim is to determine whether Defendants' proffered reasons were pretextual. There was evidence that Defendants were eager to discharge Plaintiff and were waiting to secure a well-documented case for his termination.[13] There is no evidence, however, that the County's eagerness was attributed to racial animus rather than a frustration with Plaintiff's inability to supervise and administer the ISD. In sum, the evidence demonstrates that Plaintiff's discharge was not motivated by his race.

### 2. Religion

■ An employee cannot be discharged because of religion. 42 U.S.C. § 2000e–2(a)(1). Religion is defined by Title VII as including:

> all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employers business.

42 U.S.C. 2000e(j).[14] The aim of Title VII's provision prohibiting religious discrimination

---

11. Although Sears reported Plaintiff had difficulty communicating the technical aspects of data processing, it seems that a least a portion of the difficulty is attributable to Sears' lack of experience with data processing systems.

12. Plaintiff alleges that he did the most he could with regard to personal use of County computers when he issued the inter-office memorandum. While a supervising employee cannot be expected to control every move by its employees, the fact that Plaintiff's memorandum was ignored supports Defendants' position that he was unable to effectively supervise employees within the ISD.

13. Particularly troublesome to the Court, is Mr. Sears' eagerness to discuss Mr. Evans' findings with regard to the personal computer usage. After learning that Evans had completed his investigation, Mr. Sears sent a County vehicle to fetch the snowbound Evans. Once Evans was able to make his report, Sears called Brown into his office and discharged him. The sequence of events on the day of Plaintiff's discharge illustrates Sears' over-eagerness to terminate the Plaintiff.

14. The most common type of claim under this provision is brought by an employee unable to comply with a job requirement because of a religious conviction. One example of such a case is when an employee is discharged for refusing to work on a sabbath. *See e.g. Smith v. Pyro Mining Co.*, 827 F.2d 1081 (6th Cir.1987); *Tur-*

is to ensure that individuals are hired and retained because of their job skills, not their religious background or practices.[15]

■ Plaintiff maintains that Defendants violated Title VII by failing to accommodate his religious practices and then discharged him for participating in the protected activity. There is no direct evidence of an anti-religious animus on the part of Defendants requiring a mixed motive analysis.[16] *Schleiniger v. Des Moines Water Works,* 925 F.2d 1100, 1101 (8th Cir.1991) ("Simply because a discriminatory reason might be inferred from a prima facie case does not mean that a mixed motive case exists"). Accordingly, Plaintiff must establish a prima facie case and the Defendant must come forward with rebuttal evidence.

■ Under the facts of this case, Plaintiff may establish a prima facie case of religious discrimination by demonstrating that he engaged in religious activity of which Defendants were aware and that the religious practices were a motivating factor in his discharge.[17] *See Beasley v. Health Care Service Corp.,* 940 F.2d 1085, 1088 (7th Cir. 1991); *E.E.O.C. v. Universal Mfg. Corp.,* 914 F.2d 71, 78 (5th Cir.1990); *Johnson v. Angelica Uniform Group, Inc.,* 762 F.2d 671, 673 (8th Cir.1985). The burden of establishing a prima facie case of religious discrimination is not an onerous one. The plaintiff need only show that he was discharged under circumstances which give rise to an inference of unlawful discrimination. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. at 253–54, 101 S.Ct. at 1093–94. Plaintiff established a prima facie case by demonstrating

---

pen v. Missouri–Kansas–Texas R.R., 736 F.2d 1022, 1026 (5th Cir.1984).

**15.** The intent of Title VII is well-described in a memorandum entered into the Congressional Record to support its original passage. The memorandum, quoted with approval by the United States Supreme Court, reads in part:

> To discriminate is to make a distinction, to make a difference in treatment or favor, and those distinctions or differences in treatment or favor which are prohibited by section 704 are those which are based on any five of the forbidden criteria: race, color, religion, sex, and national origin. Any other criterion or qualification for employment is not affected by this title.

*Price Waterhouse v. Hopkins,* 490 U.S. at 243, 109 S.Ct. at 1787 (quoting 110 Cong.Rec. 7247 (1964)).

**16.** As discussed with regard to race discrimination under Title VII, in order to employ a mixed motives analysis a plaintiff must produce direct evidence of discriminatory animus. Direct evidence includes statements and conduct that undeniably reveal a discriminatory attitude. *See Radabaugh v. Zip Feed Mills, Inc.,* 997 F.2d 444, 449 (8th Cir.1993). Conduct on the part of defendants that could be construed as having a legitimate nondiscriminatory purpose is generally not direct evidence. In the present case, there is no evidence that Defendants discharged Plaintiff because of a dislike for born-again Christians. Much like a race discrimination case under *McDonnell Douglas,* the Defendants in this case maintain they have legitimate reasons for discharging Plaintiff. Among those legitimate reasons is an interest in avoiding an unconstitutional entanglement with religion. Accordingly, Plaintiff has not presented evidence of a discrimi-

natory attitude sufficient to employ a mixed motive analysis.

**17.** The Eighth Circuit stated in *Johnson v. Angelica Uniform Group, Inc.,* 762 F.2d 671 (8th Cir. 1985):

> To establish a prima facie case of religious discrimination, a plaintiff must plead and prove that '(1) he has a bona fide belief that compliance with an employment requirement is contrary to his religious faith; (2) he has informed his employer about the conflict; and (3) he was discharged because of his refusal to comply with the employment requirement'.

*Id.* at 673, quoting *Brown v. General Motors Corp.,* 601 F.2d 956, 959 (8th Cir.1979).

Generally, a Plaintiff must demonstrate that the employer was informed of the employee's religious beliefs. Under the facts of the present case, however, it is enough that Polk County knew of Plaintiff's religious activity. Unlike the usual religious discrimination case, Plaintiff does not allege he was discharged for violating an employer's previously established religiously neutral policy. Instead, the policy was made known to Plaintiff in response to his already accomplished religious activity. Therefore, the requirement that a Plaintiff inform the employer of the religious activity is not essential to demonstrate an "inference of unlawful discrimination". *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253–54, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1980). The elements of proof in employment discrimination cases were not meant to be "rigid, mechanized or ritualistic." *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). *See Shapolia v. Los Alamos Nat'l Laboratory,* 992 F.2d 1033 (10th Cir.1993) (example of how prima facie case altered to meet the facts of the case).

he is a born-again Christian who was disciplined by his employer for religious on-the-job activity and that his discipline played a role in his termination.

▮▮▮ Once a prima facie case is established, the burden shifts to the Defendants to produce evidence that no accommodation was possible without subjecting it to undue hardship. *Cook v. Chrysler Corp.*, 981 F.2d 336, 339 (8th Cir.1992); *United States v. Bd. of Educ. of School D.*, 911 F.2d 882, 886 (3d Cir.1990).[18] Although undue hardship is generally evaluated in terms of economic costs, an employer may also meet the undue hardship standard by establishing the accommodation would compromise the rights of others. For instance, in *Cook v. Chrysler Corp.*, 981 F.2d 336 (8th Cir.1992), the Eighth Circuit Court of Appeals held that an employer did not have to accommodate an employee's need for time off for a religious observance when such an accommodation would violate the terms of the collective bargaining agreement and infringe on the rights of co-employees. *Id.* at 338–39.

Likewise, in the present case Plaintiff seeks an accommodation with more than economic implications for the employer. Plaintiff asserts a need to pray and quote scripture during working hours. Such a need conflicts with the County's duty to maintain a religiously neutral working atmosphere. *See County of Allegheny v. American Civil Liberties Union Greater Pittsburgh Chapter*, 492 U.S. 573, 579, 109 S.Ct. 3086, 3093, 106 L.Ed.2d 472 (1989); *Edwards v. Aguillard*, 482 U.S. 578, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987); *Smith v. County of Albemarle*, 895 F.2d 953, 960 (4th Cir.), *cert. denied* 498 U.S. 823, 111 S.Ct. 74, 112 L.Ed.2d 48 (1990). Allowing supervisors and employees to witness and pray on County time would work an undue hardship on the County's duty of religious neutrality. As a supervisor, Plaintiff's testimonials could be viewed by employees as religious endorsements attributable to County government. *See e.g. United States v. Board of Education of School D of Philadelphia*, 911 F.2d 882 (3d Cir.1990); *Spratt v. County of Kent*, 621 F.Supp. 594, 600–01 (W.D.Mich.1985), *aff'd* 810 F.2d 203 (6th Cir. 1986), *cert. denied* 480 U.S. 934, 107 S.Ct. 1574, 94 L.Ed.2d 766 (1987). Moreover, religious activity may lend itself to the type of conduct prohibited by Iowa's own Civil Rights laws forbidding religious harassment and discrimination. *See Vaughn v. Ag. Processing Inc.*, 459 N.W.2d 627 (Iowa 1990). Therefore, after careful consideration of the law in the area of religious practices and the prohibition on the establishment of religion, the Court concludes that Defendants could not have accommodated Plaintiff's religious needs without undue hardship.

▮▮▮ Even if Defendants failed in their duty to accommodate Plaintiff's religious beliefs, however, Plaintiff has not established that he was discharged because of his religious activity. *See Joyner v. Garrett*, 751 F.Supp. 555, 564 (E.D.Va.1990). Indeed, the duty to make a reasonable accommodation does not mean that an employer has to accommodate the employee, rather than discharge the employee, when the employee's performance is otherwise inadequate. *See Baz v. Walters*, 599 F.Supp. 614 (C.D.Ill. 1984) *aff'd* 782 F.2d 701 (7th Cir.1986). As previously discussed, Defendants extend numerous nondiscriminatory reasons for Plaintiff's discharge. The evidence confirms it was inadequate performance which led to Plaintiff's termination. Accordingly, Plaintiff cannot recover under Title VII or the Iowa Civil Rights Act.

## SECTION 1983: CONSTITUTIONAL RIGHTS

▮▮▮ Plaintiff also claims a violation of 42 U.S.C. § 1983 which reads:

> The term religion includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business. 42 U.S.C. § 2000e(j).

---

18. An employer's duty to reasonably accommodate an employee's religious beliefs was recognized in *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977). The employer's duty of accommodation was incorporated into Title VII through the definition of "religion" which reads:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, or any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ...

Plaintiff alleges a violation of his rights under the First Amendment to the Constitution and the Equal Protection Clause of the Fourteenth Amendment. Namely, Plaintiff argues he was terminated for exercising his First Amendment rights.[19]

■ Public employees who are terminated for exercising their First Amendment rights may seek redress under 42 U.S.C. § 1983. *Rankin v. McPherson,* 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987); *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972); *Pickering v. Bd of Education,* 391 U.S. 563, 569, 88 S.Ct. 1731, 1735, 20 L.Ed.2d 811 (1968); *see also Huang v. Bd. of Governors of University of North Carolina,* 902 F.2d 1134 (4th Cir.1990). To prevail on such a claim, the Plaintiff must first establish his conduct was entitled to constitutional protection. Plaintiff must then demonstrate that the protected activity was a substantial or motivating factor in the decision to take action against the employee. The burden then shifts to the employer to present evidence that the employee would have been terminated even in the absence of the protected conduct. *Mt. Healthy City School Dist. v. Doyle,* 429 U.S. 274, 284–85, 97 S.Ct. 568, 574–75, 50 L.Ed.2d 471 (1977); *Erickson v. Pierce County,* 960 F.2d 801 (9th Cir.1992); *Derrickson v. Bd. of Educ. of St. Louis,* 703 F.2d 309 (8th Cir.1983).

■ In the present case, the first issue is whether Plaintiff's conduct was entitled to constitutional protection. Although the First Amendment's guarantee of the freedom of religious belief is absolute, the freedom to act on that belief is not. *Bowen v. Roy,* 476 U.S. 693, 698, 106 S.Ct. 2147, 2151, 90 L.Ed.2d 735 (1986). Likewise, not all forms of expression are protected speech. The issue in the present case, therefore, is whether Plaintiff's conduct is the type of activity the First Amendment was intended to protect. *See Rankin v. McPherson,* 483 U.S. 378, 383, 107 S.Ct. 2891, 2896, 97 L.Ed.2d 315 (1987).

■ As previously explored, Polk County has a duty to ensure that its employees, particularly their supervisors, remain neutral with regard to religious matters. *See County of Allegheny v. American Civil Liberties Union,* 492 U.S. at 579, 109 S.Ct. at 3093; *Lynch v. Donnelly,* 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984); *Roberts v. Madigan,* 921 F.2d 1047 (10th Cir.1990); *see also O'Malley v. Brierley,* 477 F.2d 785, 793 (3d Cir.1973) (priests have no absolute right under First Amendment to enter a prison to conduct religious services and counseling). As one court noted:

Administrators of public institutions, such as schools and prisons, are required to balance the first amendment rights of their employees to freely exercise their religions against the first amendment's prohibition on the "establishment" of religion and against the free exercise rights of other individuals.

*Spratt v. County of Kent,* 621 F.Supp. at 600–01. When there is a danger that a supervisor's beliefs will impinge on the beliefs of subordinates, state regulation of religious conduct is particularly justified.[20] Accordingly, neither the Free Exercise Clause nor the First Amendment's free expression guar-

---

19. The acts Plaintiff complains of may "fairly be said to represent official policy", of Polk County and are therefore appropriate for consideration under 42 U.S.C. § 1983. *Monell v. Dept. of Social Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Jane Doe "A" v. Special Sch. Dist. of St. Louis,* 901 F.2d 642 (8th Cir.1990).

20. A limitation on religious activity does not contravene the Establishment Clause if (1) the enactment has a secular purpose, (2) its principal or primary effect neither advances nor inhibits religion, and (3) it does not foster an excessive entanglement with religion. *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).

antee protect Plaintiff's religious activity on County time or with County facilities.

■ The religious items kept in Plaintiff's office do not constitute the type of "expression" subject to First Amendment protections.[21] Moreover, Plaintiff has not established that the removal of religious items from his office inhibited his ability to freely exercise his religion. *See Messiah Baptist Church v. County of Jefferson*, 859 F.2d 820 (10th Cir.) *cert. denied* 490 U.S. 1005, 109 S.Ct. 1638, 104 L.Ed.2d 154 (1989). Accordingly, Sears' directive to remove the items, although arguably overzealous,[22] does not rise to the level of a constitutional violation.

### 3. *Equal Protection*

■ Plaintiff has likewise not carried his burden in establishing an equal protection violation. In order to succeed on an equal protection claim, a plaintiff must demonstrate that an illegitimate criteria created the basis for disparate treatment. *See Agarwal v. Regents of the University of Minnesota*, 788 F.2d 504 (8th Cir.1986). Likewise, equal protection is denied only where the adverse employment action is motivated by discriminatory animus. *See e.g. FSK Drug Corp. v. Perales*, 960 F.2d 6 (2d Cir.1992); *Abdullah v. Gunter*, 949 F.2d 1032 (8th Cir.) *cert. denied* — U.S. —, 112 S.Ct. 1995, 118 L.Ed.2d 591 (1991); *Arroyo Vista Partners v. County of Santa Barbara*, 732 F.Supp. 1046 (C.D.Cal.1990).

■ In the present case, Plaintiff did not establish that his termination was the result of religious or racial animus. Although other employees involved in religious activity and personal use of computers were not discharged, those employees were not entrusted with the responsibility of administering an entire department. As Defendants demonstrated at trial, Plaintiff's discharge was prompted by a series of events which called into question Plaintiff's ability to govern the ISD. It was Plaintiff's failure as a *supervisor*, therefore, which prompted his termination. No other supervisor was involved in the various instances of inappropriate behavior and inadequate performance which served as the basis for Plaintiff's discharge. Furthermore, the County's policy with regard to religious witnessing, proselytizing and counseling applied to all County employees and not just the Plaintiff. Because Plaintiff did not prove that he was treated in a particular way because of his religion or race, his equal protection claim must also fail. *See United States v. Sperry Corp.*, 493 U.S. 52, 110 S.Ct. 387, 107 L.Ed.2d 290 (1989); *Massachusetts v. Feeney*, 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979); *McQueary v. Blodgett*, 924 F.2d 829 (9th Cir.1991).

### CONCLUSION

Plaintiff has failed to establish that his termination violated the mandates of Title VII or 42 U.S.C. § 1983.

Accordingly, IT IS ORDERED that judgment shall be entered for the DEFENDANTS.

---

21. Even if, however, Plaintiff was able to establish that such items constituted a First Amendment expression, the expression does not constitute a matter of public concern. Only expressions relating to matters of public concern are protected by the First Amendment in the employment context. *See Rankin v. McPherson*, 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987); *Dorsett v. Bd of Trustees for State Colleges & Universities*, 940 F.2d 121 (5th Cir.1991).

22. The Court would like to further address Mr. Sears' directive to remove all religious items from Brown's office. Although this Court has concluded that such a directive does not rise to the level of a constitutional violation, it is somewhat troubled by Mr. Sears' order. Brown complied with the County's orders to cease witnessing, counseling and proselytizing. Sears, however, felt it was necessary to also order Brown to remove all evidence of his faith from his personal work space. Sears' prohibition required Brown to expel from his office items of personal meaning, such as the stained glass plaque which belonged to his deceased brother. Generally, Brown's religious items were positioned for his viewing; not to inundate others with a religious message. The Bible was kept in a drawer for Brown's retrieval. Under these circumstances, the Court is not convinced that removal of all these items from Plaintiff's office was essential to prevent the County's excessive entanglement with religion. In this Court's view, a reasonable compromise could have been achieved.